JACK SCOTT v. STATE OF NEBRASKA.

FILED MAY 15, 1931. No. 27541.

*M. L. Poteet* and *G. E. Price,* for plaintiff in error.

*C. A. Sorensen, Attorney General,* and *Clifford L. Rein, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY and DAY, JJ.

EBERLY, J.

This is an appeal by Jack Scott, hereinafter called the defendant, from a conviction on a charge of burglarizing the Denton State Bank with explosives on the night of January 29/30, 1930. The evidence is wholly circumstantial.

The state relies for conviction on evidence that in a house, garage and curtilage rented by one Holtzclaw and occupied by him, his wife, and little child, as a home, on the day ensuing the commission of the burglary, there was found, concealed, burglar tools, dynamite, caps and fuses for same, two bottles of nitroglycerine, a syringe for use therewith, two revolvers, one with a touch of soap thereon similar to soap used by the burglars at the bank, and $755.42 in currency; that in a stolen automobile, abandoned at a schoolhouse a mile distant from the Holtzclaw home, but on the public road between it and Denton, there was found $10 in dimes and a silver quarter.

The Denton State Bank coin wrappers in which some of the money was found, the peculiarly marked ten-dollar gold piece, and the watch fairly identified the property thus discovered as the proceeds of the Denton State Bank burglary. It also appears that on the night of the burglary Scott did not return to his lodgings until 2 a. m.

On the part of the defendant it may be said that none of the property thus identified was found on his person, or in his possession, or in any containers owned or controlled by him, or in a room exclusively occupied by him; that, when he was arrested and searched, in his billfold was found $16.56 in money bearing no identifying marks. There was concealed on his person two ten-dollar bills. In view, however, of the fact that the Denton State Bank, according to the evidence, lost but twenty-nine ten-dollar bills, and in the money thus found and identified as the proceeds of the burglary was included forty-one ten-dollar bills, it is obvious that no presumption of guilt can arise from the possession by Scott of the two concealed ten-dollar bills.

The evidence, however, fairly connects Holtzclaw with the commission of the crime. For three weeks prior to the burglary, Scott was admittedly a boarder and lodger in Holtzclaw's home, and paid a weekly stipend for this service. Still it may be said there is no evidence which

directly associates Scott with Holtzclaw during the night of January 29/30, 1930. Even the evidence as to his return at 2 a. m. is given in connection with a statement that at the time of his return he was in company with two men, neither of whom was Holtzclaw, and neither of whom, so far as disclosed by the information in this case and the evidence in the record, is charged by the state with participation in this offense. There is, in the record, no direct evidence of conspiracy between Holtzclaw and this defendant.

Appellant presents numerous assignments of error, including a challenge to the sufficiency of the evidence, but stresses in his argument the alleged misconduct of the county attorney.

As to the sufficiency of the evidence, it may be said that this court seems committed to the view that the mere presence of stolen property in a house leased and occupied by a third party, with whom the accused was living, and thus an occupant of the house, does not make the lessee's possession of the stolen articles in question that of the accused, to the extent of holding the latter accountable in law for the possession of stolen property. *Graeme v. State*, 118 Neb. 113. See, also, *People v. Wilson*, 7 App. Div. (N. Y.) 326; *State v. Castor*, 93 Mo. 242; *Turbeville v. State*, 42 Ind. 490; *Conkwright v. People*, 35 Ill. 204; *State v. Drew*, 179 Mo. 315.

It must be remembered in this connection, however, that, where the evidence has connected the defendant and another person as participants in the theft or burglary, evidence of the fact that the property stolen was found in the possession of such other person is admissible against the defendant. But in order to render such evidence competent there must be evidence of conspiracy, which may be direct or circumstantial. *State v. Drew*, 179 Mo. 315.

It being deemed necessary to reverse this conviction on other grounds, and to award a new trial, at which the evidence may be materially different, the question of the suffi-

ciency of the evidence in the present case is not determined.

As we are, in reviewing a conviction by a proceeding in error by statute, required to determine the effect of errors "after an examination of the entire cause," the evidence outlined will be considered, whether required or not, in the light of its proper legal weight and effect, in connection with the assignments of error based on the alleged "misconduct of the prosecuting attorney." The charge was burglary, a felony, and the defendant elected not to be sworn or appear as a witness in his own behalf.

The following unquestioned principles of law and statutory provisions thereupon became operative and controlling:

(1) "As a general rule, evidence of other crimes than that with which the accused is charged is not admissible in a criminal prosecution." *Fricke v. State,* 112 Neb. 767.

(2) "In the trial of all indictments * * * against persons charged with the commission of crimes or offenses, the person so charged shall, at his own request, but not otherwise, be deemed a competent witness; nor shall the neglect or refusal to testify create any presumption against him, nor shall any reference be made to, nor any comment upon, such neglect or refusal." Comp. St. 1929, sec. 29-2011.

(3) "A witness may be interrogated as to his previous conviction for a felony. But no other proof of such conviction is competent except the record thereof." Comp. St. 1929, sec. 20-1214.

From a careful examination of the bill of exceptions we determine that, in view of the rule announced in *Zediker v. State,* 114 Neb. 292, and sections 20-1139, 20-1140, 20-1919, 29-2020, Comp. St. 1929, sufficient exceptions were taken on behalf of accused, and that it thus reflects the following facts for our consideration:

(1) That in his opening statement to the jury in this case the county attorney said: "The state will prove that the defendant has served numerous sentences in numerous

penitentiaries on previous occasions, one for attempted manslaughter."

(2) That later, during the progress of the trial, in his argument to the jury, the county attorney said, in substance: "According to the law of Nebraska, the defendant had a right to take the stand and the state had no right to put him on the stand, but he could have taken the stand if he had wished to, and if he is innocent, why didn't he take the stand?"

(3) Referring to a statement claimed to have been made by the defendant Scott to the county attorney prior to the trial, and no competent evidence thereof appearing in the record, the following remark was made by the county attorney to the jury: "He (Scott) said, 'I will tell it down at the time of the trial who he had been shooting craps with.' Do you know? Have you been told? Do we know yet?" These statements, in view of their context in the record, were operative to challenge the special attention of the jury that Scott had not taken the witness-stand and made the promised explanation.

(4) The county attorney repeatedly referred to defendant Scott as an "ex-convict."

(5) The county attorney in his concluding address to the jury said, in substance: "Now, I told you at the opening of the trial what I thought the facts were going to be. I told you what the state expected to prove. I told you what the situation was and what the evidence would be. * * * And the only thing I failed to prove, I told you this man (Scott) had been convicted of two or three other crimes. * * * I am sorry; I tried to prove that, but the court wouldn't permit me to. It happens to be the law unless a man takes the stand, then you can ask him."

(6) The county attorney remarked further: "And I will tell you another point, although they may interrupt me. * * * Do you know that when you render a verdict of not guilty that ends the lawsuit and the state's hands

are tied? * * * On the other hand * * * if you find a man guilty and your verdict isn't supported by the evidence the court stands between that man and the penal institution."

We are convinced that there are no new legal principles involved in this record. The defendant has not had a fair trial, particularly as guaranteed by the Constitution. *Cooper v. State,* 120 Neb. 598; 16 C. J. 890; *State v. Lapage,* 57 N. H. 245; *Call v. State,* 39 Okla. Cr. Rep. 264; *Jones v. State,* 88 Ark. 579; *State v. Moon,* 167 Ia. 26; *Hunt v. State,* 28 Tex. App. 149; *Curtis v. State,* 89 Ark. 394; *Crow v. State,* 33 Tex. Cr. Rep. 264; *State v. Biggerstaff,* 17 Mont. 510.

It may be said that at consultation the judges were tentatively of the opinion that this case was ruled by *Cooper v. State, supra,* and on authority of that case were for reversal. A minority, however, expressed the view that in that case due consideration had not been given section 29-2308, Comp. St. 1929, and expressed a dissent on that ground. In view of this situation, it was thought advisable to reexamine the statute referred to, the history of the enactment thereof, the principles of interpretation involved, as well as the constitutional provisions applicable to the controlling questions presented.

In 1921 there was duly enacted chapter 157, Laws 1921, which appears in our present compilation as section 29-2308. It, in terms, incorporates in our statute law, as applicable to the review of criminal cases, the following provisions: "No judgment shall be set aside, or new trial granted, or judgment rendered, in any criminal case on the grounds of misdirection of the jury, or the improper admission, or rejection of evidence, or for error as to any matter of pleading or procedure, if the supreme court, after an examination of the entire cause, *shall consider that no substantial miscarriage of justice has actually occurred."* Thus it may be said that, so far as this enactment is applicable, the real question presented here, as in

all cases of criminal review, is: Had a "substantial miscarriage of justice actually occurred?"

It will be noted that this statute does not in terms declare that the determination by the reviewing court, "after an examination of the entire cause," that the accused was guilty as charged shall operate to change the essential character of errors appearing in the record before it, which otherwise would amount to a "substantial miscarriage of justice," and render the same unavailing for the purpose of review. Indeed, the statute does not in terms require an examination of the entire evidence upon which any criminal prosecution was determined.

The principles embodied in this enactment, as applied to criminal procedure, if new in this jurisdiction at the time of its passage and approval, were, however, in their essentials, far from novel in the history of modern jurisprudence. Particularly is this true when the legislation of the English speaking peoples of the world is considered. Indeed, due to the construction of similar statutory provisions by the courts of last resort of the various British jurisdictions, even the phraseology employed in our act had been, substantially, judicially considered and interpreted in connection with the fundamental principles of English common law, and its true meaning settled and application indicated, prior to its adoption here, to such an extent that it had in England acquired a definiteness and certainty almost technical in character.

The following contains the pertinent portions of statutes and rules which, in this connection, the British courts have been called upon to consider and construe, which in a proper sense may be considered as the original source of American legislation, and also following each paragraph the leading English cases relating thereto are noted, viz.:

(1) The proviso of section 423 of the Criminal Law Amendment Act of 1888 (46 Vict. No. 17) is: "Provided that no conviction or judgment thereon shall be reversed, arrested, or avoided on any case so stated, unless for some

substantial wrong or other miscarriage of justice." *Makin and Wife v. The Attorney General for New South Wales,* 17 Cox Cr. Cas. 704, 711 (1893).

(2) Order XXXIX, rule 6 of the supreme court (of England), adopted pursuant to Judicature Act of 1875, provided: "A new trial shall not be granted on the ground of misdirection, or of improper admission or rejection of evidence, * * * unless in the opinion of the court to which the application is made some substantial wrong or miscarriage has been thereby occasioned in the trial." *Bray v. Ford,* L. R. App. Cas. 44 (1896).

(3) S. 4, sub. s.l, of the Criminal Appeals Act of 1907 (England) provided: "The court may, notwithstanding that they are of the opinion that the point raised in the appeal might be decided in favor of the appellant, dismiss the appeal *if they consider that no substantial miscarriage of justice has actually occurred."* *The King v. Dyson,* L. R. 2 K. B. Div. 454 (1908) ; *The King v. Norton,* L. R. 2 K. B. Div. 496 (1910).

(4) Section 1019 of the Canada Criminal Code provides: "No conviction shall be set aside or any new trial directed, although it appears that some evidence was improperly admitted or rejected, or that something not according to law was done at the trial, or some misdirection given unless, in the opinion of the court of appeal, some substantial wrong or miscarriage was thereby occasioned on the trial." *Allen v. The King,* 44 Can. Sup. Ct. 331 (1911) ; *Brunet v. The King,* Can. L. R. 375 (1928) ; *Stein v. The King,* Can. L. R. 553 (1928) ; *Sankey v. The King,* Can. L. R. 436 (1927).

All of these statutory provisions evidence the regular exercise of unlimited and paramount legislative authority vested in the English parliament. All of the cases cited thereunder proceed on the theory that, while obvious verbal distinctions can be made between the sections above quoted, the underlying principles of law evidenced by each are quite similar, if not identical, and each vest the court

of review with discretion to exercise in cases where improper evidence has been admitted, or proper evidence rejected, or something not according to law was done at the trial. Such discretion must be exercised, however, in such a way as to do the prisoner no substantial wrong or to occasion no miscarriage of justice, as no greater wrong can be done a prisoner than to deprive him of the privilege of a trial by a jury of his peers on a question of fact material to the actual issue to be determined, and to substitute therefor the decision of the judges who have not heard the evidence and who have never seen the prisoner. The fact must not be overlooked that it is the free, unbiased verdict of the jury that the accused is entitled to have. Further, a substantial wrong and a substantial miscarriage of justice "is occasioned thereby in the trial" when the counsel for the Crown improperly places before the jury inadmissible evidence which may improperly influence them adversely to the accused on a material issue or cause improper procedure at the trial obviously in prejudice of the rights of the accused even though other evidence properly received is ample to sustain the verdict rendered.

The pioneer as well as leading case on the subject, the doctrine of which is now universally accepted by British and Colonial jurists, is *Makin and Wife v. The Attorney General for New South Wales, supra.* It involved the construction of the proviso in the Criminal Law Amendment Act of 1888, heretofore set out. The following excerpt from the opinion by Lord Chancellor Herschell, who delivered the opinion of the court, clearly sets forth the reasoning on which the case proceeds, and which won for it universal acceptance by the British and colonial bench and bar, viz.: "It was said that, if without the inadmissible evidence there were evidence sufficient to sustain the verdict, and to show that the accused was guilty, there has been no substantial wrong or other miscarriage of justice. It is obvious that the construction contended for transfers

from the jury to the court the determination of the question whether the evidence, that is to say, what the law regards as evidence, establishes the guilt of the accused; the result is that, in a case where the accused has the right to have his guilt or innocence tried by a jury, the judgment passed upon him is made to depend not on the finding of the jury but on the decision of the court. The judges are in truth substituted for the jury, the verdict becomes theirs and theirs alone, and is arrived at upon a perusal of the evidence without any opportunity of seeing the demeanour of the witnesses and weighing the evidence with the assistance which this affords. It is impossible to deny that such a change of the law would be a very serious one, and that the construction which their Lordships are invited to put upon the enactment would gravely affect the much cherished right of trial by jury in criminal cases. The evidence improperly admitted might have chiefly influenced the jury to return a verdict of guilty, and the rest of the evidence which might appear to the court sufficient to support the conviction might have been reasonably disbelieved by the jury in view of the demeanour of the witnesses. Yet the court might under such circumstances be justified or even consider themselves bound to let the judgment and sentence stand. These are startling consequences. * * * Their Lordships do not think that it can properly be said that there has been no substantial wrong or miscarriage of justice, where on a point material to the guilt or innocence of the accused the jury have, notwithstanding objection, been invited by the judge to consider in arriving at their verdict matters which ought not to have been submitted to them. In their Lordships' opinion substantial wrong would be done to the accused if he were deprived of the verdict of a jury on the facts proved by legal evidence, and there were substituted for it the verdict of the court founded merely upon a perusal of the evidence."

The true foundation of the doctrine of *Makin and Wife*

*v. The Attorney General for New South Wales, supra,* is well expressed by Chief Justice Fitzpatrick in *Allen v. The King, supra,* in the following words: "Despite all the changes made in recent years in the procedure in criminal and quasi-criminal cases, the classic saying of Lord Hardwicke still holds that: 'It is the greatest consequence to the law of England and to the subject that these powers . of the judge and jury are kept distinct, that the judge determines the law, and the jury the fact; and if ever they come to be confounded it will prove the confusion and destruction of the law of England.' "

Thus it is that such terms as "substantial miscarriage of justice," and those of similar import, as applied to questions involved in criminal appeals, had acquired in English jurisprudence a definite meaning long prior to the adoption by our state of the act of 1921.

Whether, in view of the similarity in phrasing, the Nebraska criminal statute of 1921 is to be deemed the enactment here of the British legislation, in whole or in part, sufficient to render the adoption of the rule of construction such a situation would require in view of the changed conditions here prevailing, we need not determine. In the precise terms of our fundamental law we find defined and safeguarded the principle to which Lord Hardwicke in his observations heretofore quoted referred as persuasive when applied in the proper interpretation of the English statutes. These principles, in England admittedly subject to the supreme authority of parliament, have here attained an unquestioned supremacy and controlling force. This is evidenced by the following sections which constitute a part of those embraced in article I of the Nebraska Constitution:

Section 11. "In all criminal prosecutions the accused shall have the right to appear and defend in person or by counsel, to demand the nature and cause of accusation, and to have a copy thereof; to meet the witnesses against him face to face; to have process to compel the attendance

of witnesses in his behalf; and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

Section 6. "The right of trial by jury shall remain inviolate."

Section 3. "No person shall be deprived of life, liberty, or property, without due process of law."

Section 23. "The writ of error shall be a writ of right in all cases of felony."

In this connection it is to be remembered that "Accusations of criminal conduct are tried at the common law by jury; and wherever the right to this trial is guaranteed by the Constitution without qualification or restriction, it must be understood as retained in all those cases which were triable by jury at the common law, and with all the common-law incidents to a jury trial, so far, at least, as they can be regarded as tending to the protection of the accused." 1 Cooley, Constitutional Limitations (8th ed.) 668.

A constitutional provision that "the right of trial by jury shall remain inviolate" guarantees the continuance of that right as it existed at the time of the adoption of the Constitution. *La Bowe v. Balthazor,* 180 Wis. 419.

"This constitutional guaranty to persons accused of crime, that they shall have a fair trial by an impartial jury, inures to the benefit of every accused, irrespective of his guilt or condition in life." *Priestly v. State,* 19 Ariz. 371.

"Many of the incidents of a common-law trial by jury are essential elements of the right. The jury must be indifferent between the prisoner and the Commonwealth. * * * The jury must also be summoned from the vicinage where the crime is supposed to have been committed; and the accused will thus have the benefit on ·his trial of his own good character and standing with his neighbors, if these he has preserved; and also of such knowledge as the jury may possess of the witnesses who may give evidence

against him. * * * And the jurors must be left free to act in accordance with the dictates of their judgment." 1 Cooley, Constitutional Limitations (8th ed.) 676.

Giving due consideration to the terms in which the Nebraska Act of 1921 is couched, in connection with the constitutional provisions quoted, and the authorities, British and American, heretofore cited, we find the conclusion inevitable that, unless the terms of this legislation under consideration be deemed wholly repugnant to, and in violation of, our fundamental law, it requires, in order that its validity be sustained, a construction even more favorable to the accused than that accorded similar legislation by the British courts.

This issue is inescapable. The makers of our Constitution have addressed two important mandates to this court, which we are directed to implicitly enforce: (1) That the right of trial by jury shall remain inviolate. (2) In all criminal prosecutions, the accused shall have the right to a fair and speedy trial by an impartial jury. Controlling authorities agree that this language fairly guarantees to the citizen the right of "jury trial" without conditions, qualifications or restrictions. It must, therefore, be understood as including all common-law incidents to a jury trial, so far at least as they can be regarded as tending to the protection of the accused, and as they existed at the time of the original adoption thereof by the people of this state. One of these safeguards was that a fair determination of the facts involved in a criminal prosecution adversely to the accused, by a constitutional jury, was a prerequisite to the infliction of punishment. So, too, the duties enjoined thereby on the reviewing court are plain. They are not subject to legislative diminution or limitation, either expressly or by implication. They are imperative directions, and can be performed by a full compliance with the requirements expressed which necessitate according in full measure to the accused "a fair and impartial jury trial," wholly uninfluenced by and irrespective of his con-

dition or the opinion of the reviewing judges as to his guilt.

But other substantial reasons impelling a similar conclusion are to be found in our own legislation. A well-established principle of statutory construction is that all statutes *in pari materia* must be taken together and treated as having formed in the minds of the enacting body parts of a connected whole, though considered at different dates. *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111; *Chappell v. Lancaster County*, 84 Neb. 301; *Nebraska District of Evangelical Lutheran Synod v. McKelvie*, 104 Neb. 93.

Sections 29–2020, 29–2101, 29–2102, 29–2103, 29–2306, 29–2308, Comp. St. 1929, are statutory provisions relating to criminal procedure, and provide for the review of errors of trial courts.

These sections respectively provide (1) for the perpetuation of records of trial errors to be available on review, and indicate the extent that evidence adduced at the trial shall be preserved for that purpose; (2) for redress by trial court, and review by supreme court, of trial errors challenged by a motion for new trial based on one or more of six distinct statutory grounds (of which the second includes "misconduct of the * * * prosecuting attorney," and the fourth is: "That the verdict is not sustained by sufficient evidence or is contrary to law"); that motions for new trial shall be prepared, presented and heard as therein prescribed; (3) define the prerequisites by which the powers of the reviewing court may be invoked; (4) regulate the administration of relief in such error proceedings by this tribunal in cases where the errors in the trial have been preserved in the record and presented in strict accord with the preceding sections.

A careful examination will disclose that none of these sections in any manner attempts to, or does, modify or change the import of any other. Being *in pari materia*, they must be construed as correlated and harmonious.

Section 29-2020, Comp. St. 1929, provides that the taking and preparing of bills of exceptions shall be governed by the rules in civil cases, but prescribes as applicable alone to cases involving the fourth ground of a motion for new trial: "Where the ground of exception is that the verdict is not sustained by sufficient evidence, or is contrary to law, and the court has overruled a motion for a new trial made on that ground, the bill of exceptions shall set out the evidence." As to other cases no requirement is prescribed save as may be required in civil cases, which is: "A bill of exceptions is sufficient if it contains all of the record of the proceedings to be reviewed necessary to explain the exception taken." *Sanford v. Modine,* 51 Neb. 728. See *Dietrichs v. Lincoln & N. W. R. Co.,* 12 Neb. 225.

Legislative intent could not be more clearly expressed than that, when a record prepared in strict compliance with the provisions referred to as governing the preparation of the record preserving and making available the errors of the trial court for the purposes of review is presented to this court for its action under section 29-2308, Comp. St. 1929, such bill of exceptions must be deemed ample and sufficient "upon an examination of the entire cause" presented thereby for us to judicially determine whether a "substantial miscarriage of justice has actually occurred." There is, therefore, no statutory requirement that directs the preservation and presentation of all the evidence adduced on the trial of the merits in a criminal case where misconduct of the prosecuting attorney is relied on for reversal. Indeed, the facts involved may be such as to require the entire record to be limited to affidavits as provided by section 29-2102, Comp. St. 1929. Thus the thought that, in order to determine whether "substantial miscarriage of justice" has occurred in cases involving misconduct of the prosecuting attorney, there must be an examination of all the evidence relating to the merits and a substantial trial *de novo* to ascertain the guilt or innocence of the accused by the reviewing court, is not

only unjustified by the language of section 29-2308 but involves an express violation of the mandatory provision of the previous sections above referred to, in effect denies the accused the benefits of a fair jury trial and violates the safeguards established by the Constitution. The majority opinion and the action of this court in *Cooper v. State*, 120 Neb. 598, strictly and properly respond to the constitutional and statutory obligations imposed on this tribunal, and upon reexamination the doctrine of that case is approved.

It follows that in the present case, it plainly appearing that the accused has not been accorded a fair trial and that a substantial miscarriage of justice has occurred therein, the judgment is reversed and the cause remanded for a new trial.

REVERSED.

Rose, J., dissents.