SEBASTIANO VINCIQUERRA V. STATE OF NEBRASKA.

FILED JULY 7, 1934.  No. 29062.

*Fradenburg, Stalmaster, Beber & Klutznick,* for plaintiff in error.

*Paul F. Good, Attorney General, Paul P. Chaney,* and *Daniel Stubbs, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and THOMSEN, District Judge.

GOOD, J.

Sebastiano Vinciquerra, hereinafter referred to as defendant, was convicted of the crime of murder in the second degree. He prosecutes error to review the record of his conviction.

At about the hour of 11 o'clock p. m., on the night of July 3, 1933, while Earl Haning and two companions were sitting at a table in a basement room in his home in Omaha, Nebraska, three shots were fired through the window screen, each piercing the body of Haning, from the

effects of which he died six hours later. No one, except possibly Haning, saw the person who did the shooting, and it is highly improbable that he saw, because the room in which they were sitting was well lighted, and the assailant was outside in darkness. Defendant and one Emmons were arrested and charged jointly in an information with committing the crime. Defendant was given a separate trial. All the evidence relating to the person who fired the shots is circumstantial, unless, as above indicated, Haning could, possibly, have seen his assailant.

Defendant complains of the reception of certain evidence given by Officer Brigham, who testified that he took defendant to the hospital, where Haning was lying on an operating table, and that Haning there stated: "Well, you sure did it this time." He was then looking at the defendant. The officer asked him: "Are you sure he is the man that shot you?" and Haning answered: "Sure, he is the man that shot me." This officer testified that defendant neither admitted nor denied the accusation. This evidence was admitted at the trial, without objection.

Whether evidence of this character should be received in evidence is a matter over which the decisions of the courts of this country are not in harmony. In the case of *O'Hearn v. State*, 79 Neb. 513, it was held that the test of admissibility of statements, made in the presence of one accused of crime who remains silent, is whether the time, place and circumstances surrounding the transaction are such as to lead to the inference that the accused, by his silence, consented to the truth of the statements. However, in the present case, we are not called upon to pass on the question, since no objection was made and no opportunity given the trial court to rule upon the question. A defendant may not permit questionable or incompetent evidence to be admitted without objection, take the chance of a favorable verdict, and thereafter complain of its admission.

Complaint is made of the giving of the following instruction:

"The evidence in this case is largely what is known as circumstantial evidence; that is, evidence of facts and circumstances tending to indicate guilt, rather than testimony of eyewitnesses.

"You are instructed that in considering circumstantial evidence, if the circumstances tend to prove some fact equally consistent with defendant's innocence or guilt; then you must find all such facts in favor of the defendant."

It is contended that all the evidence is circumstantial, and that the use of the word "largely" in the instruction was prejudicial to defendant. Two eyewitnesses testified to the fact of the shooting, although these witnesses did not see the person who fired the shots. They did see the flash from the gun through the window and their effect upon the body of Haning. The use of the word "largely," even though the facts were all circumstantial, could not have been prejudicial to defendant.

Defendant complains of the refusal of the court to give a requested instruction on circumstantial evidence. The requested instruction is to the effect that, to warrant a verdict of guilty of the crime charged on circumstantial evidence, such evidence must be of a very conclusive nature and tendency, convincing on the whole, leading to a satisfactory conclusion and producing, in effect, a reasonable and moral certainty that the defendant, and no other, committed the offense charged; that the test to determine the sufficiency of circumstantial evidence in a criminal prosecution is whether the facts and circumstances proved, tending to connect the defendant with the crime, are of such conclusive and positive a nature as to exclude, to a moral certainty, every rational hypothesis except that of defendant's guilt.

In *Smith v. State,* 61 Neb. 296, it was held: "To justify conviction on circumstantial evidence, it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and, when taken together or as a whole,

must be of such a character as to be consistent with each other, and with the hypothesis sought to be established thereby, and inconsistent with any reasonable hypothesis of innocence." See, also, *Walbridge v. State*, 13 Neb. 236; *Bradshaw v. State*, 17 Neb. 147; *Casey v. State*, 20 Neb. 138; *Kaiser v. State*, 35 Neb. 704; *Davis v. State*, 51 Neb. 301; *Morgan v. State*, 51 Neb. 672; *Johnson v. State*, 53 Neb. 103; *Cunningham v. State*, 56 Neb. 691; 16 C. J. 763; 8 R. C. L. 225, sec. 222.

No instruction was given by the court to guide the jury in determining the sufficiency of circumstantial evidence to warrant a conviction. In the instant case, the defendant was shown by the evidence to have served a term in the penitentiary prior to the commission of the offense charged. He was under a cloud, and his own testimony would naturally be discredited, to some extent at least, by the jury. Under such circumstances, the requested instruction, or one similar to it, should have been given, and failure so to do was prejudicial to the rights of defendant.

There are other assignments of error relating to alleged misconduct of prosecutor and of the court. We have examined them and find them without merit.

Because of the failure of the court to give the requested instruction, or one similar to it, the judgment is reversed, and the cause remanded for a new trial.

REVERSED.

PAINE, J., dissenting.

I respectfully dissent from the main opinion, reversing the judgment and sentence of 15 years to the penitentiary upon a verdict of the jury, returned October 11, 1933, finding the defendant guilty of murder in the second degree.

The deceased was shot just before 11 p. m., July 3, 1933, while sitting in the basement room of his residence with John Rice and Millard Burress, and died a few hours later. Three shots were fired through the basement window, all going into his body, two going clear through. His wife had just gone up to the living-room above the basement

when she heard the three shots fired. The husband, with blood streaming from wounds in his chest and abdomen, got upstairs and laid down on the davenport, and said, "He got me this time." His wife asked, "Who?" and Haning said, "Vinciquerra," referring to the defendant in this case, who had formerly been her husband. She married the defendant in 1913, divorced him in 1920, remarried him in 1922, divorced him in 1926, and married Earl Haning, the deceased, in 1928, and while they had been separated at times, the deceased living in Norton, Kansas, for a while, they had again been living together, at the place where the shooting occurred, for some months. She testified that about two years previously, in 1931, there had been trouble between the defendant and the deceased, in which both of them were wounded as a result of shooting between them. She testified that about this time, 1931, referring to the defendant: "He told me he would like to run across him and would like to have me tell him where he could find him, or if I could give him an idea where he could get him. I told him Mr. Haning had left the city of Omaha, and in fact the state of Nebraska; that he was staying in Kansas, just to get him off the track. * * * Q. Did he state in his conversation that he wanted you to tell him where he was at a definite time? A. Yes, sir. Q. What reason did he give? A. Because he wanted to kill him. He wanted to get even with him."

A. C. Anderson, chief of detectives, Omaha police department, reached the home of Louise Haning, at 2002 North Forty-eighth street, in response to her call, just after her husband had been removed to the hospital. He made a careful search of the basement, and found one bullet in the basement and three exploded shells outside the house from a .32 caliber automatic. The defendant later admitted to the detective that he was the owner of a .32 Colt automatic, and said it was at the store that he was conducting at Twenty-eighth avenue and Locust street. The defendant at that time told him that he did not want any first degree murder "rap" placed against him

when Emmons was the man who fired the shot. The detective asked him how Emmons got possession of the gun, and he said he got it out of the drawer in his store, and was drunk at the time, and added that they would find the gun near the chicken house. An intensive search was made for the gun, both at the defendant's chicken house and the Emmons' chicken house, at which place it was found in a hollow log. It had five cartridges in the magazine and one in the barrel, the gun holding nine when fully loaded. Several days after the shooting, while the defendant was under arrest, he was brought into Detective Anderson's office, where a knife and shells were on the desk. The defendant noticed them, and said, "That is my knife and those are my shells;" the shells being of foreign manufacture. The detective asked him to tell about the shells, and he said, "I at one time bought a whole box of them." The three bullets fired into the deceased were from this box of foreign manufactured cartridges, which are about 3/1000 of an inch smaller, but work in the gun all right.

Roland McDonald, a member of the police force, assigned to the identification bureau, and being the ballistic expert of the department, made many tests with the gun, the shells, and the same kind of bullets fired from the same gun, and told of examining the bullet found in the body of the deceased with a microscope, together with marks of the firing-pin blows on the primer on the empty shells, and testified that the bullets had been fired from the defendant's gun, and that the three empty shells found outside the basement window bore marks showing that they had been fired from the defendant's gun.

Clifford Bovee was a half block from the place when the shooting occurred, and when he got to the corner he saw a model A Ford coupé, of dark color, drive out of the driveway of the deceased's house. The car had no lights burning at the time.

A police officer went to the Haning home immediately after the shooting, and then to the store of the defendant,

where they immediately arrested him, and his car, a model A Ford coupé, was parked outside; the radiator was still warm, and it was a dark colored car.

The defendant in his evidence endeavored to show an alibi, and that he and Emmons were some place else, riding around in his car at the exact time of the shooting, but the jury failed to be impressed in any way by this attempted alibi.

Vernon Clark, a filling station operator, testified that, between 10:30 and 10:45, a very few moments before the shooting, the defendant drove into the station for gasoline; that he acted queerly, and witness watched him carefully, as he thought he might be a holdup; that Emmons came from Riley's café across the street and got in the car and they drove away.

The deceased was sitting in the basement facing the window opening from which the three shots were fired into his chest and stomach. The window was open, there being no glass or anything to obstruct his view of the murderer, save the screen. The others in the room saw the light of the flashes; the deceased at once positively stated that it was the defendant who shot him. I find nothing in the evidence to make it impossible that the deceased, facing the window and, looking out after the first shot, did not see and recognize the defendant. He never wavered from this positive recognition during the six hours he remained alive. Exhibit No. 19 is a picture taken from the inside of the basement room of the aperture, showing the screen with the three bullet holes through it, and a very clear outline of a police officer standing outside the window, and this picture was taken the same night at 11:30 p. m. The evidence shows that when deceased was lying upon the operating table in the hospital, and the defendant was brought into the room, he made the statements set out in the main opinion, the last one being, "Sure, he is the man that shot me." This evidence was given at the trial without objection, and was clearly proper under the authority of *O'Hearn v. State,* 79 Neb. 513, 25

L. R. A. n. s. 542. See, also, *State v. Guffey*, 39 S. Dak. 84; *State v. Claymonst*, 96 N. J. Law, 1.

The defendant took the witness-stand and denied that he shot the deceased. He was asked when he had been at that house previously, and answered, "I never have been there for fifteen months,—that time I got shot with Earl Haning." He testified that in 1929 or 1930 he married another woman, but that they were now divorced, and that he had only been back at his place of business about 10 minutes when the officers arrested him the night of the shooting. When cross-examined about statements he made to the police the night he was arrested, he said: "I answered questions down there I never should have." It is very rarely indeed that such definite, positive, and convincing evidence can be produced in a murder trial, as was given to the jury in this case, upon which to base their verdict of guilty.

In the main opinion this conviction and sentence are reversed because the trial judge gave instruction No. 15 on circumstantial evidence, when he might have chosen a much better one. As printed in the defendant's brief, it reads as follows:

"The evidence in this case is largely what is known as circumstantial evidence; that is, evidence of facts and circumstances tending to indicate guilt, rather than testimony of eyewitnesses.

"You are instructed that in considering circumstantial evidence, if the circumstances tend to prove some fact equally consistent with defendant's innocence or guilt, then you must find all such facts in favor of the defendant."

Defendant objects to the use of the word "largely" because defendant claims that the evidence was "entirely" circumstantial. This objection has little foundation, for a large amount of evidence is "direct" evidence of the most positive sort.

It stands to reason that the trial judge, by giving more time and care, could have selected a very much better instruction upon circumstantial evidence, from the dozens

of approved instructions on circumstantial evidence found in text-books on instructions to juries, but in the haste of the trial he dictated and gave the one above set out. Are there such vital defects and important omissions in the instruction as given as to have prejudiced the defendant, and to make it mandatory upon this court to reverse this verdict and sentence? I claim that the instruction as given was favorable to the defendant, and not prejudicial to his interests.

Next, I claim that this court is positively forbidden to reverse this conviction and sentence by enactment of our legislature, being the last paragraph of section 29-2308, Comp. St. 1929, reading as follows:

"No judgment shall be set aside, or new trial granted, or judgment rendered in any criminal case on the grounds of misdirection of the jury, or the improper admission, or rejection of evidence, or for error as to any matter of pleading or procedure, if the supreme court, after an examination of the entire cause, shall consider that *no substantial miscarriage of justice has actually occurred.*"

We find that this section was added to our law by an amendment introduced by Senator Walter V. Hoagland, an experienced trial lawyer, and, upon its passage, was approved by the governor April 8, 1921. It has been contended that, whenever this provision of our law conflicts with our Constitution, the legislative enactment fails.

I admit that it must be applied cautiously, and that it is subject to sections 3, 6, and 11, art. I of the Constitution, and that no case could be affirmed under its provision if such decision was violative of any one of these three sections. In examining each of these constitutional provisions, it is my opinion, that the defendant in the case at bar was not deprived of his liberty without due process of law, as promised him in section 3, art. I of the Constitution, and he has been given a fair and impartial trial by a jury, as promised to him in section 6, art. I of our Constitution, and has faced the witnesses testifying against him, and been protected by the other provisions set out in

section 11, art. I of our Constitution, and these witnesses who faced him at his jury trial gave such overwhelming and convincing evidence that the jury promptly returned a verdict of murder in the second degree against him.

This last part of section 29-2308, Comp. St. 1929, was given an extended discussion in the opinion reversing *Scott v. State*, 121 Neb. 232, and extensive quotations were made from the leading English case of *Makin and Wife v. The Attorney General for New South Wales*, 17 Cox Cr. Cas. 704. Let us examine the *Makin* case, which is cited as a precedent for a reversal of criminal cases, in spite of the section of our statute cited above. Makin and wife were found guilty of the murder of Horace Amber Murray, being an illegitimate baby, under 10 weeks' old, the child of a domestic servant, which the Makins had taken in to nurse upon the payment of a small sum, and upon their representation that they desired to adopt the infant as their own. During the trial of the case, evidence was introduced showing the finding of the bodies of other little infants under circumstances implying that Makin and wife might have been connected with their deaths also. The admission of such evidence was immediately attacked, and the trial judge, realizing the weight of the objection, reserved passing sentence on the prisoners. Lord Chancellor Herschell, in reviewing the case, said that the trial court was wrong in admitting evidence of the finding of the bodies of other infants, and set out that it was claimed there was no evidence of how the little infant came to his death, or that he was murdered by the defendants, but that if, without the inadmissible evidence, there was evidence sufficient to sustain the verdict, and to show that the accused were guilty, then there would be no substantial wrong, or miscarriage of justice. The final paragraph in this case reads as follows: "Their Lordships desire to guard themselves against being supposed to determine that the proviso may not be relied on in cases where it is impossible to suppose that the evidence improperly admitted can have had any influence on the verdict of the jury, as

for example where some merely formal matter not bearing directly on the guilt or innocence of the accused has been proved by other than legal evidence."

Another English case referred to is that of *Allen v. The King,* 44 Can. Sup. Ct. 331. Allen, a private soldier, was tried for shooting his captain at Victoria, British Columbia, and sentenced to death, the defense being temporary insanity by reason of overindulgence in alcohol. In this long opinion of more than 30 pages, the Canadian provision, found in section 1019 of the Canada Criminal Code, is set out, and is very similar to the last paragraph of section 29-2308, Comp. St. 1929, under discussion in this case, and it is shown that in the trial of the case Allen was asked whether a witness, Corrigan, had not testified, in the preliminary hearing in the police court, of threats made by Allen against Captain Elliston, and a number of such very damaging statements testified to by Corrigan at the preliminary hearing were thus injected into the evidence, although at the time this was done Corrigan had left the army as a consequence of being afraid to stand cross-examination if called as a witness at the jury trial, and was not in the province when the trial was held. It is clear from this statement of the facts that substantial wrong was done to the defendant, Allen, by the admission of this highly improper evidence, and that the court was right in setting aside the conviction of Allen for miscarriage of justice although dissents were filed.

These two cases were doubtless closely in point when applied to the facts in *Scott v. State, supra,* but can they be used with equal force as precedents in the case at bar, where the reversal is based largely on the fact that the court failed to give the jury a guide to determine the sufficiency of circumstantial evidence to warrant a conviction?

I believe the jury gave only the proper weight to the circumstantial evidence under the instruction given them, which told them that, if a fact was equally consistent with the guilt or innocence of the defendant, they must find all such facts in favor of the defendant.

In our present state of unrest, resulting in a rising tide of lawlessness and crime, this court should, in my opinion, be very reluctant to reverse verdicts of juries unless the members of this court can say that a substantial miscarriage of justice has occurred, as required by section 29-2308, Comp. St. 1929.

I adopt the language of Judge Rose in his dissenting opinion in *Cooper v. State,* 120 Neb. 598, and close this dissent with his words: "I made 'an examination of the entire cause,' and I say with conviction there was no prejudicial error or miscarriage of justice in the proceedings and sentence. Under the evidence a verdict of not guilty would have been a travesty on justice and a reproach to the law."

DAY, J., concurring.

The majority opinion holds that the instruction on circumstantial evidence inadvertently given by the able and experienced trial judge was reversible error. This was made imperative because the defendant requested an instruction which this court has held to be a proper and a necessary one since *Walbridge v. State,* 13 Neb. 236, was decided in 1882, which opinion was written by Maxwell, J. Numerous cases have been decided by this court upon the identical question involved in this case, including those cited in the majority opinion, and the rule has never been questioned until the dissenting opinion in this case.

It is neither a minor nor an inconsequential error. The trial judge stated in his instructions to the jury that the evidence is largely circumstantial. I not only made an examination but read the entire record and can say with a conviction equal to that of my distinguished associate that the evidence connecting the defendant with the crime charged is entirely circumstantial. The dissenting opinion intimates that the reversal was based upon the trial court's failure to cross a "t" or dot an "i." That is not the fact as an impartial reading of the opinion would disclose. For many years, this court has taken an advanced position and refused to reverse judgments for inconse-

quential technical objections which were not prejudicial and obviously would not and did not change the result of a trial. In *Nichols v. State*, 109 Neb. 335, an opinion by Rose, J., held: "In a criminal prosecution an immaterial variance between the complaint before the examining magistrate and the information filed in the district court is not a ground of abatement, where the same crime is properly charged in both." See, also, *Clarke v. State*, 125 Neb. 445. In order that a conviction may be grounded safely upon circumstantial evidence, "it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and, when taken together or as a whole, must be of such a character as to be consistent with each other, and with the hypothesis sought to be established thereby, and inconsistent with any reasonable hypothesis of innocence." *Smith v. State*, 61 Neb. 296. This rule obtains in the great majority of state courts. So also does it apply in the federal courts.

Section 6, art. I of the Constitution, provides: "The right of trial by jury shall remain inviolate." This would seem to entitle the defendant to a jury trial when charged with murder. Chapter 20, art. XI (b), Comp. St. 1929, provides the only method of trial by jury in this state. Section 20-1111, Comp. St. 1929, provides that the trial judges shall instruct the jury in writing upon the law applicable to the case. Quoting from *Webb v. State*, 140 Tenn. 205, annotated in 15 A. L. R. 1034, we find it specially applicable to this case: "In such a case, the main fact—the *factum probandum*—is the fatal stroke, and if there be no direct testimony connecting the accused with the main fact, as the slayer, and the sole evidence is circumstantial, it is error not to instruct the jury as to the rules applicable to that kind of evidence. The error is of the class denominated fundamental. It goes essentially to the basis of the accused's theory for defense."

The people of this state by constitutional provision have decreed that one charged with crime is entitled to a jury

trial. A jury drawn, as it is, from the community, made up of men of varying experiences in life, can only be expected to weigh the evidence in a case, properly, when they are correctly and simply instructed upon the law applicable. The defendant in this case, guaranteed as he was a jury trial, had a right to have the evidence against him weighed by a jury according to the well-known and long-accepted rules of law. He was denied this right. The dissenting opinion does not question so much the correctness of the instruction tendered by defendant, but contends that it was unnecessary in this case. It takes excerpts of testimony from the record from which the conclusion is drawn that the defendant in this case is guilty of the crime charged. The excerpts are those most unfavorable to the defendant, and the inferences therefrom are not impartially drawn. Having determined from this statement of the facts that the defendant is guilty, it is then argued that section 29-2308, Comp. St. 1929, forbids the reversal of the judgment. If the court were to do this, it would be usurping the function and invading the province of the jury. This court has not been given authority to determine the guilt or innocence of a defendant in a criminal case. It is required to observe and support the Constitution of the state and that Constitution provides that a defendant shall have a jury trial. It means that his guilt or innocence shall be determined by a jury under proper instructions as to the law by the court. For this court to sustain a conviction of a defendant where there is a substantial error in a fundamental instruction to the jury, informing them as to the manner in which they shall weigh the evidence, would in fact be a practical denial of a jury trial. This matter was ably discussed in *Scott v. State,* 121 Neb. 232. In that opinion, the history of this statute was traced from the time when it was adopted first in England down to the present day. It is unnecessary to repeat that discussion here, but we refer to it as stating the position of this court upon this question and applicable to this case. However, it does seem neces-

sary to quote conclusions from the *Scott* case. "The scope and effect of the provisions of section 29-2308, Comp. St. 1929, can be determined only in connection with constitutional provisions, and with other sections of the statutes *in pari materia*." It was further held: "It does not authorize this court to declare that there has been no substantial miscarriage of justice in a criminal case, merely because the court from an examination of the evidence may believe the defendant guilty of the crime charged." The *Scott* case ought to be a sufficient answer to every contention of the minority opinion. In *Stowe v. State,* 117 Neb. 440, opinion by Goss, C. J., this court held that error as to matters of pleading or procedure violating constitutional rights of accused will not be ignored. In *Kleinschmidt v. State,* 116 Neb. 577, opinion by Howell, J., it was held that section 29-2308, Comp. St. 1929, has no application where the province of the jury is prejudicially invaded. See, also, *Fetty v. State,* 119 Neb. 619.

This court has recognized that section 29-2308, Comp. St. 1929, is to be liberally construed in favor of justice, as a remedial statute. *Cryderman v. State,* 101 Neb. 85. It was so construed in *Norton v. State,* 119 Neb. 588; *Broquet v. State,* 118 Neb. 31; *Clarke v. State,* 125 Neb. 445. In the last cited case, it was held, in an opinion by Shepherd, District Judge, that a "variance, if any, between information charging automobile as defendant in liquor case and complaint describing car, but not particularizing, *held* not prejudicial." (250 N. W. 551.) These decisions are representative of the trend followed by this court over a long period of time.

Summarized, the position of this court has been that an immaterial matter not affecting the substantial rights of a defendant was not prejudicial, reversible error. But this court has never yet ignored the violation of a defendant's constitutional right. The argument of the minority opinion is untenable. To follow it to its logical conclusion and apply it to a hypothetical case indicates its fallacy. Suppose a trial judge submitted a case to a jury of men un-

trained in weighing evidence without any instructions whatever. Such a jury, uninstructed as to the law applicable to the case, could not be expected to return a just and lawful verdict with any reasonable certainty. Could this court then examine the evidence and determine the defendant's guilt? The constitutional guaranty to a jury trial would be nullified. In the first place, the legislature in the act of 1921 (Laws 1921, ch. 157) had no intention to deny a defendant the right to a jury trial. If it had any such intention, it was without power to amend the Constitution. This statute was probably suggested to Senator Walter V. Hoagland, who introduced the bill, by similar enactments in other states and in England. Senator Hoagland, who is an experienced and capable trial lawyer, undoubtedly recognized the beneficent and useful purpose of such a statute in preventing retrials of cases for inconsequential errors. But it cannot eliminate from this court's consideration a fundamental error that goes essentially to the basis of a theory of a defense. It cannot deprive a defendant of his constitutional right to a jury trial.

It is not necessary to analyze the evidence or the excerpts and inferences of the minority opinion for that the duty and responsibility of weighing the evidence and determining the guilt or innocence of the defendant has not been placed upon the members of this court. When and if that duty is constitutionally commended to this court, it will be assumed and discharged. Until such a time, this court should continue to function within constitutional limitations and not usurp powers which have definitely not been given to it.

The minority opinion inquires whether the authorities can be used with equal force as precedents with the case at bar where the reversal is based largely on the fact that the court failed to give the jury a guide to determine the sufficiency of circumstantial evidence to warrant conviction. That squarely presents the question, but we are unable to understand by what process of reasoning it is

determined that the jury without a proper instruction to guide them, in weighing circumstantial evidence, gave it only the proper consideration. Even those who view with alarm what is termed the rising crime wave should be the last to desire to destroy and nullify constitutional provisions which guarantee human liberties and human rights. Trial by jury is such a guaranty. The jury was established in our jurisprudence as a guaranty against the tyranny and oppression of an absolute monarch, unaccountable to the people. History reveals that in a republic one may usurp power and become as tyrannical as the ruler of a hereditary monarchy. In times past, executions have been most frequent, and without what we are accustomed to term a trial, under a régime established in the name of the people. If the fight of the state against criminals is unequal, it is not because of the constitutional stability of the courts so much as it is because the state is unwilling to furnish those charged with the enforcement of the law personnel and equipment sufficient to carry on the struggle. It is no solution to the problem to say that because the officers of the law are too few in number, inadequately armed, and have inefficient equipment, the quantum of proof should be less and a man charged with crime should be convicted except by a proof of his guilt according to the age-old rules which have stood the test. It would be the easy and the lazy way.

If according to the minority opinion "a verdict of not guilty would have been a travesty on justice and a reproach to the law," the state would not need an unfair and unconstitutional advantage to obtain a conviction. If this were a fact, the defendant would have been convicted if his constitutional rights had been observed. But the interest of the state is not served by sentencing a man to penal servitude, unless the evidence has been weighed, and he has been found guilty of a violation of the criminal laws of the state. The purpose of the criminal law is to punish the guilty.

But it has often been said and so often reiterated that

it has become looked upon as an axiom that only the guilty escape punishment and that no innocent man is ever convicted. Professor Edwin M. Borchard, professor of law in Yale university, in a recent interesting book entitled "Convicting the Innocent" has compiled the history of sixty-five criminal prosecutions and convictions of completely innocent people. This author has in a very able manner analyzed these cases and exemplified the manner in which these mistakes in the administration of justice occur. His conclusions are so compelling and practical as to interest one who is anxious to determine why the result of a trial is not always accurate. Professor Borchard at page XIII says: "Perhaps the major source of these tragic errors is an identification of the accused by the victim of a crime of violence. This mistake was practically alone responsible for twenty-nine of these convictions. Juries seem disposed more readily to credit the veracity and reliability of the victims of an outrage than any amount of contrary evidence by or on behalf of the accused, whether by way of alibi, character witnesses, or other testimony. These cases illustrate the fact that the emotional balance of the victim or eyewitness is so disturbed by his extraordinary experience that his powers of perception become distorted and his identification is frequently most untrustworthy."

There was no identification in the case at bar by any eyewitness, unless it can be said that the alleged statement of the murdered man amounts to such identification. Let it be remembered that this happened after 10 o'clock at night; that the murdered man was in the basement and was shot by somebody on the outside, in the dark, through the screen. The statement of the murdered man was not that he saw the defendant shoot him, but rather that the defendant "got him."

Quoting further from Professor Borchard, at page XIV he states:

"Erroneous convictions on circumstantial evidence exclusively * * * are not many, yet enough to be disturbing. Of the eleven cases of this type here recorded, eight in-

volve charges of murder in the first degree and convictions of murder in the first or second degree.

"No one will suggest that circumstantial evidence should be excluded as a form of evidence. On the contrary, it is often convincing and conclusive. That it is, nevertheless, often misleading and unreliable, the cases here reported attest. Chief Justice Shaw, in his celebrated charge to the jury in Dr. Webster's case (*Commonwealth v. Webster*, (1850) 5 Cush. (Mass.) 295, 312), said: 'The advantages (of circumstantial evidence) are that, as the evidence commonly comes from several witnesses and different sources, a chain of circumstances is less likely to be falsely prepared and arranged, and falsehood and perjury are more likely to be detected and fail of their purpose. The disadvantages are, that a jury has not only to weigh the evidence of facts, but to draw just conclusions from them; in doing which, they may be led by prejudice or partiality, or by want of due deliberation and sobriety of judgment, to make hasty and false deductions; a source of error not existing in the consideration of positive evidence.' "

Quoting further from Professor Borchard, page XVIII: "Public opinion is often as much to blame as the prosecutor or other circumstances for miscarriages of justice. Criminal trials take place under conditions with respect to which public interest and passions are easily aroused. In fourteen of the cases in this collection in which the frightful mistake committed might have been avoidable, public opinion was excited by the crime and moved by revenge to demand its sacrifice, a demand to which prosecutors and juries are not impervious. This can by no means be deemed an argument for the abolition of the jury, for judges alone might be equally susceptible to community opinion. But it is a fact not to be overlooked."

We have only quoted from Professor Borchard in so far as his conclusions seem applicable to and helpful in the case at bar. This able analysis and discussion of actual cases demonstrate that innocent men are sometimes convicted. But it is not necessary for us to go outside of our

own state for a demonstration that a mistake may be made and an innocent man convicted. Alvah L. Lytle was convicted of bank robbery. His conviction was affirmed upon appeal to this court. *Lytle v. State*, 120 Neb. 869. In that case, the evidence was not circumstantial. Lytle was positively identified by the president and three employees of the bank. He was also identified by a man who observed him enter the bank. After serving more than two years in prison, another confessed the crime and was able to prove to the county attorney, the president of the bank, and sheriff that he and not Lytle committed the robbery. This erroneous conviction resulted because five witnesses who positively identified Lytle as the man who held up the bank were mistaken.

A further reason might be because, as stated in the report of the county attorney to the pardon board at the time of his conviction, he did not bear a very good reputation by reason of his bootlegging activities. When convinced of their mistake, the county attorney, the sheriff, and the president of the bank hastened to make amends and secured a pardon. It is a frequent argument of those who contend that no conviction should be reversed because of the expense of a new trial. They seem unmindful of the fact that the conviction of an innocent man damages the individual more than the state can recompense. It is a serious thing to send a man to the penitentiary for a crime which he did not commit. It places a stigma upon him which will blight his entire life. In connection with the *Lytle* case, chapter 11, Laws 1933, is of interest and indicates that convicting an innocent man is often expensive for the state. It is as follows:

"An act for the relief of Alvah L. 'Doc' Lytle; to appropriate the sum of $2,500 therefor out of the general fund.

"Preamble

"Whereas, Alvah L. 'Doc' Lytle, a resident of the city of Superior, county of Nuckolls, state of Nebraska, on March 22, 1930, then a peaceable and lawabiding citizen, happily married, his immediate family consisting of a wife and

small child, and while pursuing the lawful occupation of a chef was arrested, and was on March 22, 1930, after a trial had in the district court of Kearney county, Nebraska, sentenced to the Nebraska state penitentiary for the crime of robbing the Exchange National Bank of Minden, Kearney county, Nebraska, said robbery having occurred on March 20, 1930 (actually December 20, 1929) ; and

"Whereas, on March 22, 1930, said Alvah L. 'Doc' Lytle was sentenced to serve a term of not less than 12 nor more than 15 years in said penitentiary,—at all times protesting his innocence of said crime as charged, and an alibi being his defense and established by a number of witnesses, but disregarded by the court and jury in said case; and

"Whereas, approximately two years thereafter, one John L. Webster was arrested in the state of Illinois, for bank robbery, committed at Bartonsville, Illinois, and upon his arrest, said Webster confessed not only to the Illinois bank robbery, but also fully confessed to the robbery of said Exchange National Bank of Minden, Kearney county, Nebraska, and set forth in complete detail the mode and manner in which said Exchange National Bank of Minden, Kearney county, Nebraska, was robbed; and

"Whereas, the said Webster's confession convinced the county attorney of Kearney county, the district judge before whom said Alvah L. 'Doc' Lytle had been tried that the wrong man had been convicted; and

"Whereas, a full and complete hearing was had before the Nebraska state board of pardons and paroles which exonerated said Alvah L. 'Doc' Lytle, said opinion of the said board of pardons and paroles, dated March 8, 1932, being concluded as follows:

" 'After reviewing the newly discovered evidence, we are satisfied that Lytle is innocent of the charge on which he is serving, conviction is therefore held for naught, and it is ordered that Alvah L. Lytle be discharged and restored to all his civil rights;' and

"Whereas, the character and reputation of said Alvah L. 'Doc' Lytle, prior to his unwarranted and unlawful conviction of a felony, as aforesaid, was exemplary and above reproach; and

"Whereas, after serving approximately two years in the Nebraska state penitentiary for a crime which he, the said Alvah L. 'Doc' Lytle was innocent, he received upon his discharge from said penitentiary the usual ten dollars that is given to every departing convict; and

"Whereas, Alvah L. 'Doc' Lytle has been incalculably injured in his good name, honor and reputation by the atrocious mistake made by the peace officers, the prosecutors and the courts of this state and in equity and good conscience should, in a measure, be recompensed for the great wrong, humiliation and suffering which this unfortunate miscarriage of justice has brought to him; now therefore

"Be it Enacted by the People of the State of Nebraska:

"Section 1. That there is hereby appropriated out of the general fund of the state of Nebraska, the sum of twenty-five hundred dollars for the relief of Alvah L. 'Doc' Lytle.

"Section 2. Said sum so appropriated shall be in full of all claims and demands on the part of said Alvah L. 'Doc' Lytle against the state of Nebraska on account of his wrongful conviction of the felony of bank robbery by the courts of this state; and the auditor of public accounts is hereby authorized and directed to draw a warrant for the amount therein specified upon the general fund; and the state treasurer is hereby directed to pay said warrant to Alvah L. 'Doc' Lytle, his heirs, successors or assigns, that said payment be made only on condition that said Lytle pay counsel for service in securing this payment not to exceed fifteen per cent. (15%) of amount paid."

This case exemplified the expense to the state of the wrongful conviction of an innocent man. It also is positive proof that an error can and has occurred. But it poorly expresses the great injury suffered by Mr. Lytle.

It ought to impress police officers, prosecuting attorneys and judges with the grave responsibility resting upon them to protect society from the criminal and yet at the same time to so perform their various duties that no innocent man shall suffer an ignominious conviction.

In conclusion let us summarize:

A.  The trial court failed to give the jury a guide to determine the weight of the circumstantial evidence.

B.  That the failure to give the proper instruction on circumstantial evidence is a fundamental error, and goes essentially to the basis of the accused's theory for defense.

C.  That this court cannot weigh the evidence and determine the guilt of the defendant and then under section 29-2308, Comp. St. 1929, determine that no substantial miscarriage of justice has actually occurred, where a substantial right has been denied.

D.  That this court cannot usurp the function and invade the province of the jury and thus deny the defendant his constitutional right to a jury trial.

E.  That a failure to observe constitutional rights increases the possibility of error from which lamentable consequences follow.

EBERLY, J., joins in the concurring opinion.