Note—See (2) 3 R. C. L. 526; 1 R. C. L. Supp. 843; 4 R. C. L. Supp. 193.

FRED WILLIAMS V. STATE OF NEBRASKA.

FILED MARCH 1, 1927.    No. 25379.

1. Criminal Law: MENTAL CAPACITY: PROOF. In a criminal prosecution, where the mental capacity of defendant to commit the crime charged is raised by opinion evidence, in response to a hypothetical question and given by a physician called as a witness by the defendant, such evidence may be rebutted by the evidence of nonexpert witnesses, who testify about facts and circumstances surrounding the commission of the crime, and to defendant's appearance, actions, conduct and language at and about the time of the commission of the alleged crime. And such evidence may be sufficient to justify the jury in finding, beyond a reasonable doubt, that defendant was legally responsible for his act in committing the crime charged.

2. Homicide: MENTAL CAPACITY: SUFFICIENCY OF EVIDENCE. Evidence examined and *held* sufficient to warrant the jury in finding, beyond a reasonable doubt, that at the time of committing the offense charged defendant knew what he was doing and could distinguish between right and wrong with respect to his acts constituting the crime charged in the information.

3. Criminal Law: CONVICTION: CONFLICT OF EVIDENCE: REVIEW. This court, in a criminal action, will not interfere with a verdict of guilty, based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt.

4. ———: INSTRUCTIONS: REVIEW. Whether instructions given by the court to the jury correctly state the law must be determined from an examination of the entire charge, and not by a single sentence or paragraph thereof.

5. ———: ———: MENTAL CAPACITY. An instruction in a criminal action, relating to the defendant's mental status, and which

informed the jury that defendant must know what he was doing and must know right from wrong with respect to the particular act at the time of the commission of the offense charged, *held* to be a correct statement of the law, as applied to the facts set forth in the opinion.

6. ———: NEW TRIAL: DISCRETION OF COURT. Whether defendant should be awarded a new trial for alleged misconduct of the jury is a question addressed to the sound judicial discretion of the trial court, and will not be disturbed unless an abuse of such discretion is shown.

7. ———: MISCONDUCT OF JURY: Misconduct of the jury, or of the bailiff having them in charge, unless prejudicial to the rights of the defendant, constitutes no ground for reversal.

ERROR to the district court for Douglas county: CHARLES A. GOSS, JUDGE. *Affirmed.*

*Jamieson, O'Sullivan & Southard,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Harry Silverman, contra.*

Heard before ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ., and SHEPHERD, District Judge.

GOOD, J.

For shooting and killing his wife on the morning of November 30, 1925, Fred Williams, hereinafter called defendant, was convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for a term of 20 years. To review the record of his conviction, he prosecutes error to this court.

The first assignment of error is that the verdict is contrary to law and not sustained by sufficient evidence.

That defendant shot and killed his wife is admitted; but it is contended that at the time of the homicide the defendant was not in such a mental condition as to be legally responsible for his actions. It is also urged that, where evidence has been adduced, tending to show that a person charged with crime is not in such mental condition at the time of the commission of the offense as to be legally ac-

countable for his act, then the burden is upon the state to prove, beyond a reasonable doubt, every element necessary to constitute the commission of the crime, and also that defendant's mental condition was such that he would be legally accountable for his act. The rule of law contended for is undoubtedly sound, but the question presented is: Are the facts proved sufficient to sustain a finding, beyond a reasonable doubt, that defendant, at the time of the commission of the offense, was legally responsible for his act?

Defendant called as a witness a physician, who, in response to a hypothetical question reciting, in substance, the facts detailed by the defendant and some other of defendant's witnesses, testified that in his opinion defendant, at the time of the homicide, did not know right from wrong with respect to the particular act. No other direct evidence of defendant's mental condition was offered, and the only evidence bearing upon defendant's impaired mental condition, if such existed, was such as might be inferred from the testimony as to his actions, language and conduct at the time of and immediately before and after the shooting of his wife. Counsel for defendant seem to take the view that some direct evidence by the state was essential to meet the evidence adduced by defendant. The opinion of the physician was based upon the assumption that all the facts set forth in the hypothetical question were true. Some of the matters in the hypothetical question were not proved. and, as to many others, the evidence was in conflict. Under such circumstances, it was for the jury to determine what weight should be given to the opinion of the physician. The state did not call expert witnesses as to the defendant's mental condition, but the facts and circumstances surrounding the commission of the crime and defendant's actions. language and conduct were fully set forth in detail, and from these the jury were required to determine the question.

Are the facts proved sufficient to warrant the jury in finding that defendant knew right from wrong with respect to

the act that he was committing when he shot and killed his wife? The evidence is very voluminous and we shall not attempt to summarize all of it, but will outline some of its salient features.

It appears that defendant is, by occupation, a printer and linotype operator; that he and his wife had been married for about five years; that they lived in one side of a duplex house at 817 Park avenue, in the city of Omaha; that de- fendant was engaged most of the time at his occupation, and that the wife, for the purpose of helping to maintain the home and provide for household expenses, furnished room and board to a number of persons; that the defendant and his wife frequently had disagreements and some quarrels, but none of a serious nature until about six weeks prior to the tragedy. According to his testimony, defendant took exceptions to the conduct of one of the boarders. He testified that his wife showed a preference for this man, conducted the home and provided articles of food in deference to his, rather than to defendant's, wishes; that six weeks prior to the tragedy he and his wife had a quarrel concerning the matter, he at that time insisting that the boarder must leave the home, or defendant would do so; that his wife refused to accede to defendant's wishes; that thereupon defendant left his home and went to another place in the city of Omaha, staying about a week, and then moved to Sioux City, where he was employed at his occupation. While he was in Sioux City his wife brought an action against him for divorce. Two weeks before the fatal shooting, defendant visited his wife in a fruitless effort to effect a reconciliation. He then returned to Sioux City.

On Friday, the 28th of November, 1925, defendant was served with notice of an application for alimony in the divorce action, theretofore begun by his wife. On the next day he purchased a revolver, a box of cartridges and a knife. He testified that he purchased the revolver with the idea of committing suicide, but there is no evidence that he made any attempt upon his own life. According to his

testimony, at about 3 o'clock on Sunday, the day following the purchase of the knife and revolver, he drove to Omaha, for the purpose of making one final effort to effect a reconciliation with his wife. He testified that he reached Omaha at about 11 o'clock in the evening, and between 11 and 12 o'clock went to his home, or the home of his wife, crawled through a window into the basement of the home, intending to stay there until the next morning, and, after the boarders had gone, to see his wife. There is nothing in the evidence to indicate that there was a bed or fit place in the basement for him to sleep. He further testified that after he had been in the basement some time, perhaps 30 minutes, he heard footsteps on the floor above, going to his wife's room, which excited a suspicion of misconduct on her part; that he ascended the stairs from the basement into the kitchen, thence into the dining-room and into the living-room, which was also used as a sleeping-room by his wife; that as he went in he switched on the electric lights in the dining-room and living-room and discovered his wife and the boarder in a compromising situation; that he fired one shot and thereafter did not remember anything until he found himself telephoning to the police. He claims not to remember nor to have any knowledge of what transpired for a period of 30 or 40 minutes, and to have an imperfect knowledge and recollection of what occurred until some time the next morning.

From other evidence, it appears without question that defendant not only shot the boarder through the shoulder, but that he brutally beat his wife on the head and face with his revolver, inflicted a wound upon her with a knife, and, while he was struggling with her, another roomer on the second floor, hearing the noise, came part way down the stairs and saw defendant and his wife struggling near the foot of the stairs; that defendant pointed the revolver at this roomer and told him to go back to his room. The roomer needed no second admonition to obey the direction. At about this time Mrs. Williams escaped from defendant

and fled from the house, and collapsed upon the sidewalk in front of a public garage a few yards from the Williams home. Other witnesses, who saw her as she was leaving, testified that she was staggering and was going rather slowly until she collapsed. One of the employees of the garage, assisted by a stranger, lifted and carried her into the office and placed her in a chair. At that time she was covered with blood, and stated that her husband had beaten her, and asked to be taken to a hospital. A call was telephoned to the police station. Fifteen or twenty minutes later defendant entered the garage office, where his wife was, and when she saw him she said, "My God! there he is; he is going to kill me," or words of like import. One of the bystanders placed a hand on defendant's arm, and he responded, "I know what I am doing," and almost immediately fired four shots into his wife's body, killing her instantly. He then remarked, "Well, I guess I finished it, boys," or words to that effect. Immediately thereafter defendant left the garage, returned to his home, and attempted to telephone to the police. The police officers arrived at about this juncture, and to one of them, who made inquiry as to what the trouble was, he replied, "I will show you." He took the officer into the living-room, pointed to various articles of men's apparel and to the bed, which was apparently disarranged as though it had been occupied. Within a few moments he made statements to the officers and newspaper reporters, in which he gave in detail an account of his conduct and actions in shooting the boarder, beating his wife, and following her to the garage where he shot her to death, and stating, in effect, that any one else would have done the same thing under like circumstances.

The evidence further shows that the next morning he was taken to the hospital to see the wounded boarder. While there he went up to the bed and addressed him in friendly terms, shook hands with him and said that he did not know who it was or he would not have done it. Defendant further testified that he did not know of any misconduct on the part

of his wife or suspect her of infidelity until a few moments before the shooting; that he had only felt aggrieved because she was paying more attention to the boarder's wishes about the home and food than to his wishes. The boarder, called as a witness, testified that he came home that evening at about midnight and had a message to leave with Mrs. Williams for another of the boarders, but did not find her in the living-room and went up to his own room on the second floor. He testified that shortly thereafter he came downstairs, went into the living-room and was sitting, talking to Mrs. Williams when defendant suddenly burst into the room and shot him in the shoulder, and began to beat his wife with the revolver. The boarder escaped and went to his own room and was later taken to the hospital. He testified that he had never enjoyed any privileges other than those accorded the other roomers in the house; that all the roomers treated the place as a home and came into the living-room to read the daily papers and to visit with the members of the family and with each other. All of these roomers were called as witnesses, and they testified to a like state, and all of them testified that they had never observed any misconduct on the part of Mrs. Williams, and that all were accorded like privileges. It may be observed further that, aside from the testimony of defendant, there is not a word in the record that would indicate that Mrs. Williams was other than a virtuous lady.

A great deal of evidence was given by police officers, detectives, reporters, and others, describing defendant's appearance, his actions, language and conduct immediately after the shooting. To a number of these persons he detailed the facts and circumstances in a clear and connected manner and gave a fairly accurate statement of the occurrences. This evidence directly contradicted defendant's testimony that he had no recollection of what occurred after discovering his wife and a boarder in the living-room. The fact that shortly after the shooting, when asked what the trouble was, he said, "I will show you," and took the officers

into the living-room and pointed out articles of men's wearing apparel and the condition of the bed, tends to prove that he knew, remembered and realized fully what he had done, and was attempting to justify his actions.

Whether defendant knew that it was wrong to shoot his wife was a question of fact that may be established by the facts and circumstances surrounding the commission of the crime, together with his appearance, actions, conduct, and language, at the time of the shooting. The finding of the jury was based upon conflicting evidence. Unless we can say, as a matter of law, that the evidence on the question is so lacking in probative force that the jury should not be permitted to declare that they are convinced, beyond a reasonable doubt, of the truth of the charge, this court should not interfere with the verdict upon that ground. *Shannon v. State,* 111 Neb. 457; *Hamblin v. State,* 81 Neb. 148.

From a consideration of all the evidence, we think there was sufficient to amply justify the jury in finding, beyond a reasonable doubt, that at the time of the shooting defendant knew what he was doing and knew right from wrong with respect to the particular act.

Complaint is made of a number of the court's instructions to the jury. One of such instructions informed the jury of the essential and material averments of the information which it was necessary to establish, beyond a reasonable doubt, before the defendant could be convicted of the crime charged. In this instruction no direct reference was made to the mental condition of the defendant. One of the essential elements was stated: "That the defendant shot said Hazel Williams purposely and with deliberate and premeditated malice and with the intent to kill her." In another paragraph of the instructions, relating to the mental condition of the defendant, the jury were informed that the defendant relied upon the defense of temporary insanity or loss of his normal mental faculties to such an extent that he did not know what he was doing at the time he com-

mitted the act charged; and another paragraph informed the jury that, before they could find the defendant guilty, they must be satisfied from the evidence, beyond a reasonable doubt, that he knew what he was doing at the time, and that he was capable of discriminating or distinguishing between right and wrong with respect to the particular act charged.

It has long been the rule in this state that, where the instructions, as a whole, correctly advise the jury as to the law on the points in issue, a single instruction which, by itself, might be misleading will not be permitted to work a reversal of the judgment. *Aller v. State*, 114 Neb. 59. The instruction, stating the essential elements of the crime, was a correct instruction. It did not pretend to inform the jury that they might convict the defendant, regardless of his mental condition, and on that subject they were specifically instructed.

Complaint is made of the instructions relating to the defendant's mental status, in that two standards are given: One that defendant must know what he was doing, and the other that he must know right from wrong, with respect to the particular act, at the time.

We think the instruction given was peculiarly applicable to the evidence given by the defendant. Defendant testified that he did not know anything about, or have any recollection of, what occurred from the time that he discovered his wife and one of the boarders in the living-room of the home, until some time after the shooting. The instruction, in fact, does not set up a double standard, either of which would convict defendant, but, on the other hand, it told the jury that, if defendant did not know what he was doing at the time, or if he was not able to distinguish right from wrong with respect to the particular act, then he could not be legally convicted. The instruction was most favorable to the defendant. A careful examination of the court's charge to the jury satisfies us that it was free from any error.

Williams v. State.

Complaint is made because the court permitted, over objection, testimony of quarrels between defendant and his wife from time to time prior to the commission of the offense charged. The defendant, himself, upon the witness-stand testified to frequent quarrels, but the evidence does not disclose, either on the part of the state or of the defendant, that there were any serious quarrels prior to the time of the tragedy in question. After a careful scrutiny of the record, we do not find that the court committed any error in that respect.

It is charged that there was misconduct of the jury for which the defendant should be awarded a new trial; that one of the jurors had made statements during the progress of the trial that were derogatory of counsel for defendant, that he was satisfied the defendant was guilty, and that such remarks were made during the progress of the trial and before the taking of evidence was concluded. Each of the jurors was called and examined under oath with respect to any such statements, and the trial court, after hearing all the evidence, held that there was no misconduct in that respect, and we are satisfied that the great weight of the evidence sustains the court's ruling.

Further complaint is made of misconduct of the jury, in that, while they were deliberating on the verdict, the jury called the bailiff and asked him whether they could fix the penalty at the minimum in a conviction for second-degree murder, and that the bailiff replied that he had never known such a thing to be done. This was no doubt an irregularity. The jury should not have inquired of the bailiff; nor should the bailiff have given any answer. However, the incident does not disclose that the rights of the defendant were in anywise prejudiced by the inquiry. The bailiff neither advised nor attempted to advise the jury as to what they could or should do. No misstatement of the law or of fact was made. No prejudice to defendant's rights is shown.

It is urgently insisted that the sentence imposed is excessive and not in proportion to the gravity of the offense or

the moral turpitude involved.     This contention does not meet with our approval.     The evidence is sufficient to warrant a finding that defendant deliberately planned to murder his wife, and came to Omaha, armed, with the intention of carrying out his murderous design.     The jury were merciful and lenient in finding defendant guilty of second-degree murder.     Defendant is fortunate indeed to escape a conviction for murder in the first degree.     The story told by him was inconsistent in many respects and was so unreasonable that it did not impress all of the jurors, at least, with having much, if any, merit or truth in it.     The sentence does not seem excessive.     The trial lasted for a period of two weeks; there is a voluminous record, and in the whole thereof we fail to find any prejudicial error.

The judgment of the district court is therefore

AFFIRMED.

Note—See (2) 39 L. R. A. 737, 44 L. R. A. N. S. 125; 13 R. C. L. 713; 3 R. C. L. Supp. 76—(6) 20 R. C. L. 252.