STATE OF NEBRASKA, APPELLEE, v. JOHN HIZEL, JR.,
APPELLANT.

139 N. W. 2d 832

Filed January 28, 1966. No. 36074.

Willard F. McGriff and Alfred J. Kortum, for appellant.

Clarence A. H. Meyer, Attorney General, and Melvin K. Kammerlohr, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

BROWER, J.

The defendant John Hizel, Jr., at a trial to a jury in the district court for Scotts Bluff County, was found guilty of the crime of murder in the second degree perpetrated on the person of Elbert Eugene Hendren. He was sentenced to the Nebraska Penal and Correctional Complex for life. The defendant was not charged with

murder in the first degree. He has by an appeal brought the case to this court.

The fatal occurrence took place on Sunday, October 11, 1964. The defendant John Hizel, Jr., his wife, and stepson, Glen Dalrymple, aged 16 years, lived together in their home in Mitchell, Nebraska. Harold Dalrymple, another stepson, a single man, lived a few blocks from them. The defendant was about to go to the veterans hospital at Cheyenne for an examination. At the suggestion of Harold, the stepsons and the defendant decided to have a farewell party, or celebration, for the latter. Before an early Sunday dinner they went in defendant's 1953 Plymouth sedan to Bob's Superette at Scottsbluff and got a six-pack of beer. This they drank, each consuming two cans, on their way back to Mitchell where they had dinner with the wife and mother. After dinner between 1 and 1:30 o'clock they went to Terrytown and bought a case of Colt 45 malt liquor, referred to as ale. They then proceeded to drive and drink during the afternoon. They appear to have all become intoxicated in varying degrees. None of them remembered all of the roads they took, or the towns or places they went through, and Harold remembered very little of the trip.

Shortly before the fatal events hereafter related they had for a considerable distance been driving eastward on a narrow private road which runs on top of the dike along the Gering-Ft. Laramie irrigation ditch. Between 3:30 and 4 o'clock they were passing on this road through the farm premises where the deceased victim of the lethal shot lived. The road in that vicinity is on the north bank of the canal. Eighteen cans of Colt 45 had then been consumed. About 2/10 of a mile west of the intersection of this private road with a north and south county road passing through the same farm, the front wheel of their sedan became caught in a cattle guard they were attempting to cross, apparently because of a missing rail or plank in its floor. In extricating the

wheel an argument ensued between the two brothers. Glen said it arose as to which of them should get down and retrieve an automobile jack, used in the operation, which had fallen into the pit of the cattle guard. Its recovery did not, however, stop the argument which grew quite heated and eventually led to blows. In the end the brothers descended the dike, repaired to an adjoining meadow to the north, and engaged in "fisticuffs." The blows were intersperced with considerable shouting and swearing. The defendant got out of the sedan and attempted to separate them but failing in so doing returned to the car and took the driver's seat previously occupied by Glen. The brothers never returned to the sedan but first Glen and eventually Harold walked diagonally northeasterly across the meadow to the county road.

The deceased, Elbert Eugene Hendren, was generally referred to in the testimony as "Gene" Hendren and will be so designated herein. He lived with his wife, Wanda Hendren, on the farm through which the canal and dike road passes and where the cattle guard is located. The north and south county road extends by means of a bridge over the canal. The canal and county road cross approximately but not exactly at right angles. Immediately to the south of the canal and just to the west of the county road is the building site of the farm. It is surrounded by an extensive grove of trees. Mr. Hendren worked elsewhere and neither owned nor operated the farm. The farm which included land on both sides of the canal was owned by Ione Campbell, mother of Wanda Hendren. Mrs. Campbell lived in a separate residence at the same building site. On the morning and early afternoon of October 11, 1964, several truckloads of cattle belonging to others arrived at the home site. Mr. Hendren assisted in unloading, sorting, and corralling them. The work with respect to the last load was completed at approximately 4 o'clock that afternoon. Shortly thereafter they heard the loud talk emanating from the fight

between the Dalrymple brothers but from the farmstead could not see what was happening. The weather was dry and there were many stacks of hay upon the meadow. Mr. and Mrs. Hendren thought they should find out what was going on. For that purpose they walked out to the bridge, which was somewhat elevated, to view the meadow. They saw the defendant's car parked on the dike road and three persons in a group out on the meadow not far from the cattle guard.

Up to this point there is little dispute as to the facts. The evidence with respect to what occurred at and near the bridge is conflicting and will be outlined separately with respect to the testimony offered by the State and the defendant.

The evidence offered by the State is embodied in the testimony of Wanda Hendren and Ione Campbell who, aside from the defendant himself, are the only persons claiming to be eyewitnesses to what occurred near the bridge. Mrs. Hendren said that Gene Hendren on seeing the men on the meadow told her to go and get the pickup. Thereupon she ran or briskly walked home and got it. Mrs. Campbell who was quite deaf had seen the Hendrens walk to the bridge and knew something was going on and asked to go too. She returned with Mrs. Hendren in the pickup which was parked near the bridge on the east side of the public road. When they returned the defendant's car was parked on the ditch company road 25 or 30 feet west of the county road, close to an electric light pole. Gene Hendren was standing in front of defendant's car and the two men were just off to the side of it talking. Meantime, Glen Dalrymple, walking diagonally northeasterly across the meadow, had reached and was walking northward on the public highway some distance away but could be seen from the bridge. Mr. Hendren asked his wife to go and get the boy with the pickup. She drove northward on the road and asked him to go back with her but he refused. Glen testified he told her he wasn't going back,

he would just get into another argument. Mrs. Hendren then drove back to the bridge.

While Wanda Hendren was away with the pickup, Ione Campbell testified that she stood on the corner of the bridge. When she started to go to Gene Hendren, he motioned her to stay back. She could tell Gene and defendant were talking but because of deafness was unable to hear any of the conversation. Defendant had a gun which he was waving in front of Gene's face and Gene was taking his hands and forcing the defendant back. In this manner the two men backed up to the car door and Gene opened it and defendant got in. She never saw the gun again until after the shot. Gene made a motion which Mrs. Campbell interpreted as meaning, " 'Go on, everything is clear.' " The defendant did not start the motor but in just a little while opened the door and again stepped out by Gene. Standing there Mrs. Campbell observed Harold Dalrymple going northeasterly on the hay meadow. He took a few steps, staggered, and fell several times. About this time Wanda Hendren came back and walked over where the two men were. Mrs. Campbell said to Wanda, " 'There is a man up there that is wounded, I think,' or something." The three were standing along the defendant's car and gradually backing up toward its rear. The two men backed to the west end of the automobile when Mrs. Campbell heard a shot. She saw the defendant fall back and Gene fell at the same time. Gene got up, threw the gun in the canal, and fell again. The defendant got in his car and left.

Wanda Hendren testified that when she got back to the bridge she got out of the pickup and walked over beside her husband. The defendant was standing against his car. Defendant was telling Gene what his name was and for whom he had worked. She could tell he was incapacitated so she suggested they go home and let the defendant go his way. Gene told his wife the defendant had a gun. He asked Wanda to get it. She

walked over behind defendant and reached in his back pocket and found a billfold which she left there. She never got the gun. She asked for it and the defendant looked at her but said nothing. Gene put his arms across the defendant's arms and there was a sudden move, a scramble "such as you see on television to disarm a person." The defendant held his left hand and arm behind him. She only saw the gun an instant before it was fired. The gun was pressed deeply into her husband's stomach and then fired. Gene fell on the defendant who went down because of her husband's weight. The defendant dropped the gun as he fell. Gene got up with the gun, threw it in the irrigation ditch, and then collapsed. The defendant got in his car and drove away. The two women aided by a neighbor loaded the deceased in Mrs. Campbell's station wagon and took him to the West Nebraska General Hospital, arriving there at 5:35 o'clock p.m.

The defendant, on the other hand, testified that after trying to break up the boys' fight he sat in the car a few minutes and then drove east on the ditch bank road. He saw the Hendrens walk across the bridge. Both Mr. and Mrs. Hendren got in front of his car and stopped him. There was little room in which to pass them. The deceased ordered him not to move the car. He was beginning to get sick from the malt liquor. He took the alcoholic cure in 1958. Defendant asked Gene Hendren to let him go and showed him his identification wallet and named some of his friends. His gun was in the glove compartment of the car. He belonged to the National Riflemen's Association and used it in practice. He put it in his left pocket after being stopped. Getting out he stood on the driver's side of his car. The Hendrens continued to stand in front of his car. Defendant, weighing only 130 pounds, was afraid of being beaten up by Gene Hendren, a larger man, having suffered from beatings in the past. Mr. Hendren smelled of liquor and defendant believed he was drunk. Hendren asked

for defendant's gun and he told him he couldn't have it. The gun was put back in his pocket. He asked Mr. Hendren to let him go and started to back up. Hendren tripped him and hit him on the chest. Defendant fell on his back and Hendren jumped on top of him. Lying on his back, he was partially under the fender. Defendant's left ear was very tender and had been operated on. Hendren was sitting on defendant's stomach and struck his ear. Defendant was afraid he would strike again. He says he asked Hendren in a nice way to let him up. Hendren leaned over and let some air out of his tire. Defendant rolled over and pulled the gun out and fired. He did not know where he hit Hendren or what happened to his gun afterwards. He then got in his car and drove north on the county road. He drove past Glen Dalrymple who was walking on the road. He told him he had shot a man and asked Glen to go home with him but Glen refused, saying he was going back to see about Harold. Defendant testified he saw no woman standing on the bridge. There was only one woman there. He would have seen another if she had been there and there was no pickup there either. On cross-examination the defendant admitted he had been previously convicted of a felony.

Certain testimony concerning what happened thereafter having some bearing on the actions of the defendant and the decedent at the bridge will be mentioned.

The deceased died without being conscious except for a brief moment at the bridge. He only stated, " 'That man shot me.' " An autopsy was performed on Gene Hendren on October 11, 1964, by Dr. Francis J. Hatch who testified. Death, he said, was caused by internal bleeding from the common iliac artery caused by a gunshot wound at close range penetrating below and to the right of the navel. There was an odor of alcohol while performing the autopsy. A blood specimen of the deceased was taken for blood alcohol determination. The test showed the blood alcohol was 0.21 percent. The

doctor testified in his opinion it would take a minimum of 10 ounces of whiskey in a man of the size of Hendren to raise the blood alcohol to that percentage. Mrs. Hendren and Mrs. Campbell had testified the deceased had not used alcoholic liquor that day.

The defendant drove to his home at Mitchell. There he had 2 cups of coffee and told his wife he had shot a man. There he got a 410 shotgun and shells for it. Defendant says he went back to find the boys. Defendant drove into the farmyard of Ray Stufft, Jr. Stufft testified that he arrived at 6 o'clock or a little later and they talked over the farmyard gate. The defendant told Stufft he had shot a man, whose wife had pulled him off, and he did not know whether the man was dead or not. Defendant did not know where the shooting took place. He said he had a loaded shotgun in the car and he was going up west to get the boys and his gun left in the scuffle and finish the job. Stufft said defendant had been "drinking a plenty" and he gave little credence to his story until 10 or 15 minutes later when deputy sheriff Hanley drove in the yard and told defendant to get in the officer's car. Defendant admitting talking to Stufft but denied he ever said he was going back to finish the job. He went there to find out something about Stufft's proposed moving to Oregon. He told him only that he had shot a man and was going to find the boys.

Two patrolmen and deputy sheriff Yeoman drove into Stufft's farmyard while deputy sheriff Hanley and the defendant were still there. The defendant's car was searched and the 410 shotgun and shells taken from it as was the holster for the pistol which was lying empty on the front seat. The defendant went with Hanley in the latter's car to the scene of the shooting. The others went there too. Hanley said when he arrived there and was asked how it happened, the defendant grabbed for his hip pocket and showed how he pulled the gun out in a crouched position and shot the man. This was repeated

several times although the question was not again asked. It was testified to by deputy Yeoman also. While at the scene a patrolman testified that he obtained a urine specimen from the defendant at 7 p.m. A laboratory technician who tested it was a witness. He said the urine showed 0.18 percent alcohol by weight. This equates with about 0.14 percent alcohol when the test is made from the blood. The person from whom such a blood specimen was given would be under the influence of alcohol.

Dr. Thomas C. Tips, a medical doctor specializing in neuropsychiatry, was the only witness besides the defendant who testified for the defense. He had examined the defendant pursuant to court order. The doctor stated defendant's mental age as between 8 and 12 years. His intelligence is in the mentally defective range and his emotional development is "very limited—primitive." The defendant suffers from chronic brain damage from alcoholism. The doctor's opinion was that defendant could not exercise the same judgment as an ordinary man. His responses would react spontaneously as a child. However, defendant knows right from wrong. His history evidenced alcoholism for which he had received treatment at the State Mental Hospital at Hastings. He has mental lapses. Defendant can only write his name but can sometimes grasp the contents of a newspaper. The doctor felt the defendant was fearful of his life at the time of his shooting. Because of defendant's low mentality affected as it was by alcohol at the time he did not have the capacity to control his action. As a child he purposely and maliciously shot Hendren. The defendant needed hospitalization and in the doctor's opinion he was a permanent menace to the public safety. A report written by the doctor previous to the trial, introduced by the State on cross-examination, is in evidence. It states: "It is further my opinion, after completing the examination, that Mr. Hizel committed the act of shooting purposely and maliciously, that there is no evidence that deliberation and premeditation were

elements of the crime for which he is charged, and that he had sufficient mental capacity to distinguish right from wrong in respect to the act for which he is to be tried."

Defendant assigns error to the trial court in its refusing to sustain the defendant's motion to direct a verdict for the defendant made at the conclusion of the State's case and renewed at the conclusion of all the evidence, and in submitting the charge of murder in the second degree to the jury; and contends the verdict is contrary to the law and the evidence.

Although defendant assigns error to the trial court in failing to sustain the defendant's motion for a directed verdict in his favor, the defendant's brief contains no argument that an instructed verdict of acquittal as a matter of law would have been justified in the present case. Defendant does cite as propositions of law statements based upon two syllabi from the case of Bourne v. State, 116 Neb. 141, 216 N. W. 173, as follows: "Where a plea of not guilty is interposed on the part of the defendant in a criminal trial, he is clothed with the presumption of innocence which stands as evidence in his favor, and so remains until the state by its proof shows him to be guilty beyond a reasonable doubt. The burden of furnishing such proof is with the prosecution throughout the trial, and never shifts.

"In such a case, if the evidence or any material part thereof is fairly susceptible of two constructions, one in favor of the state, and the other in favor of the defendant, the doubt must be resolved in behalf of the innocence of the accused, as every intendment or inference under the evidence, considered in its entirety, must be construed in his favor." The evidence in the cited case was wholly circumstantial and there was evidence tending to show that the death resulted from an accident which, if true, proved the defendant was entirely blameless. The judgment was reversed in the cited case and this court did lay down the quoted rules of law. How-

ever, this court in that case did not find the evidence as a matter of law failed to show the commission of the crime. It found that the trial court erred in failing to give an instruction tendered by defendant that certain evidence elicited by the State in an effort to show a motive failed as a matter of law to so show motive and such evidence should be disregarded by the jury. Further, it found that the trial court should have submitted the issue of manslaughter to the jury and erred in not so doing. The case is no authority for sustaining the defendant's motion for a directed verdict in his favor in the case before us. The trial court committed no error in overruling defendant's motion for a directed verdict for the defendant.

The defendant's brief is directed principally toward his assertion that the trial court erred in submitting the crime of murder in the second degree to the jury. He alleges the evidence was as a matter of law insufficient to show the commission of that crime. It is because of this he contends the verdict is contrary to the law and the evidence. All of these assignments will be considered together.

The defendant calls attention to the statute on murder in the second degree, section 28-402, R. R. S. 1943, which reads as follows: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree; and upon conviction thereof shall be imprisoned in the Nebraska Penal and Correctional Complex not less than ten years, or during life." He argues that the evidence fails to show that the shooting was purposely or maliciously done. He cites the case of Runyan v. State, 116 Neb. 191, 216 N. W. 656, where this court held: "Under section 9545, Comp. St. 1922 (now section 28-402, R. R. S. 1943), a purpose to kill and malice are essential elements of murder in the second degree and, under a charge therefor, both must be proved beyond a reasonable doubt.

"Malice is never implied or presumed as a matter of law, where the circumstances of the killing are testified to on the trial by eyewitnesses.

" 'Where the evidence does not prove a higher degree of homicide than manslaughter, it may be prejudicial error to submit to the jury the issue of murder in the second degree, though the trial results in acquitting the accused of the graver offense and in finding him guilty of the lesser.' Whitehead v. State, 115 Neb. 143 (212 N. W. 35)." In that case an undercover man employed and paid by the city of North Platte was assisting other officers, including the deputy sheriff, in maintaining a roadblock in an attempt to seize a car said to be illegally transporting intoxicating liquor in violation of the prohibition laws. A car, after being stopped, started up and attempted to speed on. The defendant after giving warning to stop shot with a revolver, endeavoring to hit the tires. Another fired a rifle which shot and killed an innocent occupant of the car. The man who fired the rifle was previously convicted of manslaughter. The defendant was prosecuted as an aider and abettor of the crime of murder in the second degree and manslaughter, and convicted of the latter crime. This court held that all the testimony of the eyewitnesses showed the shooting was neither purposely nor maliciously done, and that the submission of murder in the second degree was not warranted and was erroneous and prejudicial to the defendant even though he was convicted of the lesser crime. The cited case has little application to the case before us.

In the present case the following evidence was before the jury. Before the defendant left his car he took his gun with him. He waved it in front of the deceased. The deceased kept crowding the defendant back toward his car door. Defendant at one point got in his automobile and the deceased waved him on but instead of starting his car defendant got out again with the gun in his pocket. There is evidence no blows were struck and the

deceased was merely forcing him back with Hendren's arms only in front of the defendant when a violent movement took place and the defendant shot with the gun pressed into the deceased's abdomen. The defendant testified that he pointed the gun at the deceased to scare him. He further testified: "Q Where did you shoot him? A I don't remember. Q Did you intend to shoot him? A I shot him. That's all I remember. Q Well, you took the gun out and you were going to shoot him, isn't that right? Is that right? A No, I didn't want to shoot him where it went; I was going to just catch him in the side and kind of wound him a little, but I didn't aim to. Q But you intended to shoot him? A Yes. But I begged the man to leave me go, I was sick, and he wouldn't do it. Q Were you afraid for your life? A Yes." Again he testified: "Q And before you got out of your car you reached into the glove compartment and got this gun and you figured at that time you were going to have to use it. A For my own protection—." There is other evidence that the defendant acted out what happened by grabbing for his hip pocket and showing how he pulled the gun out in a crouched position and shot the man. After the shooting he went home and got the 410 shotgun and there is evidence that he said he intended to go back to finish the job. This testimony was submitted to the jury with testimony offered by defendant by which the defendant maintains he acted in self defense. The evidence is in such complete conflict that the jury could not give complete credence to both versions of what happened. Ione Campbell testified she went to the scene in the pickup and remained while Wanda Hendren drove away to get Glen Dalrymple to return. Glen testified to speaking with her. Defendant denies Mrs. Campbell or the pickup were present. The defendant's contention alleges as error the submitting of murder in the second degree to the jury. There is no objection to

the contents of the instructions if that issue was proper to submit under the evidence.

In Buckley v. State, 131 Neb. 752, 269 N. W. 892, this court stated the rule: " 'This court, in a criminal action, will not interfere with a verdict of guilty, based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt.' Williams v. State, 115 Neb. 277, 212 N. W. 606."

In Woodard v. State, 159 Neb. 603, 68 N. W. 2d 166, it was held: "Where the evidence and circumstances of the crime are such that different conclusions may properly be drawn therefrom as to the degree, the trial court is without error in submitting the different degrees to the jury for its determination."

In the present case there was evidence from which the jury if it gave credence thereto could properly conclude the defendant shot the deceased purposely and maliciously. Certainly this court cannot under the conflicting evidence before it find that it is insufficient to support a finding of guilt of murder in the second degree as a matter of law. We find the submission of that issue to the jury was proper and that the verdict was neither against the law nor the evidence.

It follows that the judgment of the trial court was without error and should be and is affirmed.

AFFIRMED.