Charles Sedlacek, plaintiff in error, v. State of Nebraska, defendant in error.

90 N. W. 2d 340

Filed May 31, 1958. No. 34404.

*J. A. Hayward,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Homer L. Kyle,* for defendant in error.

Heard before Simmons, C. J., Carter, Messmore, Yeager, Chappell, Wenke, and Boslaugh, JJ.

Messmore, J.

By petition in error Charles Sedlacek brings here for review the record of his conviction in the district court for Lancaster County for violation of section 28-533, R. R. S. 1943. The material part of section 28-533, R. R.

S. 1943, is as follows: "Whoever willfully and maliciously, either in the daytime or night season, enters any * * * shop, store, warehouse, * * * and attempts to * * * rob or steal * * * shall upon conviction thereof be sentenced to the penitentiary * * *."

The information in substance charged that Charles Sedlacek, on or about July 17, 1957, in the county of Lancaster, and State of Nebraska, did unlawfully, feloniously, and maliciously enter a store and warehouse building to wit: Port Huron Machinery & Supply Company, a partnership, located at 803 Q Street in the city of Lincoln, Lancaster County, Nebraska, and attempted to steal certain personal property of value contained therein.

The plaintiff in error will, for the purpose of convenience, be referred to as the defendant.

The principal question raised by the assignments of error is as follows: Is the evidence sufficient to support the verdict of guilty?

As stated in Kitts v. State, 153 Neb. 784, 46 N. W. 2d 158: "The sufficiency of the evidence must be determined in the light of well-established rules of law."

Concededly, as held in Morgan v. State, 51 Neb. 672, 71 N. W. 788: "The test by which to determine the sufficiency of circumstantial evidence in a criminal prosecution, is whether the facts and circumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a moral certainty every rational hypothesis except that of his guilt.

"It is the province of the jury to determine the circumstances surrounding, and which shed light upon, the alleged crime; and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot, as a matter of law, be said to have failed. (Casey v. State, 20 Neb., 138.)" See, also, Maher v. State, 144 Neb. 463, 13 N. W. 2d 641.

As stated in Watson v. State, 141 Neb. 23, 2 N. W. 2d 589: "They do not, however, change the rule, long followed and stated by this court in Vinciquerra v. State, 127 Neb. 541, 256 N. W. 78, as follows: 'To justify conviction on circumstantial evidence, it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and, when taken together or as a whole, must be of such a character as to be consistent with each other, and with the hypothesis sought to be established thereby, and inconsistent with any reasonable hypothesis of innocence.'

" 'Where in a criminal case the evidence is circumstantial, the circumstances established, must, to warrant a conviction, be such as to exclude every reasonable hypothesis except that of the defendant's guilt. But this rule merely requires the exclusion of such hypotheses as are based on circumstances established by the evidence. It does not require the jury to acquit because of evidence which, if believed, would establish facts consistent with innocence, but which evidence the jury is justified in disbelieving.' Carleton v. State, 43 Neb. 373, 61 N. W. 699."

The ultimately applicable rule in the case at bar is that: "This court, in a criminal action, will not interfere with a verdict of guilty, based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt." Williams v. State, 115 Neb. 277, 212 N. W. 606.

In Hoffman v. State, 162 Neb. 806, 77 N. W. 2d 592, the same test by which a jury shall determine the sufficiency of circumstantial evidence in a criminal prosecution is restated as hereinbefore set out. In the cited case the court held: "After a jury has considered the evidence in the light of this rule and returned a verdict of guilty the verdict on review may not, as a matter of law for

insufficiency of evidence, be set aside if the evidence sustains some rational theory of guilt."

With the foregoing rules of law in mind we summarize the evidence to determine whether or not it is sufficient to support the verdict.

The Port Huron Machinery & Supply Company, hereafter referred to as the company, occupies a building located at 801-803 Q Street in Lincoln, Nebraska. It consists of two floors and a basement and has a frontage of approximately 75 feet on Q Street. There is a front door that leads into the building from Q Street and a door that leads into the west side of the building on Eighth Street. Towards the south end of the west side of the building there is a double door that leads onto a loading dock. The main floor of the building consists of the general offices, a sales room or display room, supply room, and a shipping room. Stairs lead to the second floor and to the basement. There is a shop on the east side of the building. It has a south entrance and a north entrance. There are four rest rooms on the main floor of the building, three for men and one for women, and no rest rooms on the second floor or in the basement.

Janis Krauze works as a clean-up man for the company and cleans the building twice a month. He testified that on July 17, 1957, he went to work about 5:15 p. m.; and that he talked to John Edwards, one of the owners of the business, at that time. He left the building about 5:35 p. m., and no one else was there. After locking the door, he and his wife, who was outside the building, went down P Street and had their supper. They returned to the building about 6:30 p. m. He opened the west door and his wife said: "Somebody run in the back room." This witness ran into the building and saw a man running toward the back room. The man was dressed in blue overalls and a light shirt, and was pretty close to the stairs to the basement. He yelled to the man to stop, but the man kept on running. He was afraid there was someone else there, so he called the

police. The police came in a couple of minutes, and he let them into the building on the west side and told them where he had seen the man. Later he saw the police take a man out of the building. On cross-examination he testified that he did not know whether or not there was anyone in the upstairs or the basement when he left, but he looked in the toilets and knew there was no one in the toilets or the office when he left to go to supper.

A detective connected with the Lincoln police department testified that on July 17, 1957, he was detailed to go to the Port Huron Machinery & Supply Company. He arrived at the building shortly before 6:35 p. m. It was still daylight, and three police officers were there. When he arrived he had a conversation with Krauze on the dock on the Eighth Street side of the building. Afterwards he entered the building, searched the main floor, and found no one. He then started searching the basement with other officers. In the basement there were various types of machines which appeared to be farm machinery, also materials stacked in paper sacks, crates, and cartons. The officers started in the south end of the building and proceeded toward the front of the building, which is north, and found a person against the east wall of the basement on his hands and knees. It was difficult to see him. He was huddled down against the wall where there was a large stack of paper sacks. They went over to where the man was. It proved to be the defendant. He was asked to get up from his position, but did not do so. He was then assisted up from his huddled position and brought out of the hiding place to the center aisle where he was "frisked and patted down" to determine whether or not there were any weapons on his person. He was handcuffed and taken out of the building by Captain Paul Beave and from there to police headquarters.

On cross-examination this witness testified that Mr. Krauze, if he be considered an employee, and his wife were there, and Mr. Leacock, a part owner of the com-

pany, was also there. The defendant's automobile was found by an officer, and there were $10,000 in stocks or bonds in his car. The defendant's car was parked on the south side of Q Street east of the building approximately five or six parking stalls west of Ninth Street.

On re-direct examination he testified that he searched the remaining parts of the building and no other person was found in the place; and that all of the other doors to the building were locked and secured.

An officer at police headquarters who was on duty on July 17, 1957, testified that defendant was brought to headquarters by two police officers and booked by the desk sergeant. This witness went through the defendant's pockets to get his personal effects and put them in an envelope. He took from the defendant a wallet, $62.96, a watch, a reamer, a small screw driver, a 6-foot tape measure, and three books of matches. These items were identified as exhibits. The three books of matches had the Port Huron label on them. The small screw driver also had "Port Huron" written on the handle.

A detective who was off duty on July 17, 1957, contacted the defendant the next morning and took him to the office of the county attorney about 10:30 or 10:45 a. m. While they were waiting, he noticed that the defendant was holding a newspaper up between the witness and the defendant, and the defendant was fooling around with the pencil compartment in his overall bib. The officer noticed there was a paper clip there, and he removed it and took out of the pencil compartment a little reamer. The defendant was wearing blue striped overalls at that time. The defendant told this witness that he got the reamer from his brother's machine shop in Crete. Later he said that he got it in the dime store in Omaha the Saturday before.

Ted Leacock, a partner in the company, testified to the location and size of the various departments in the building, the different items handled by the company, and their location in the building. He further testified

that he left the building between 5:25 and 5:30 p. m., on July 17, 1957; and that when he left John Edwards, a partner of the firm, and Janis Krauze were there, and Glen Witt, who worked under John Edwards, could have been there. He further testified that he was called back to the building, and arrived there shortly after 6:30 p. m. Upon arriving, he was denied admittance by a police officer who informed him the building was being searched. In about 5 minutes two other police officers arrived and he went into the building with them. Later the officers brought the defendant up from the basement. This witness further testified that he asked the defendant how he got into the building. The defendant gestured toward the north door on the west side of the building and said that he did not come in the double doors, and that he came into the building about 3 p. m. that day. This witness remained at the building for about 20 minutes that night and then returned to his home. He arrived at work the following morning at about 10 minutes to 8 a. m. He testified that there is a pop machine in the building to the left as you enter the double doors on the west. He observed that the mechanism of this machine had been tampered with to the extent that bottles could be taken therefrom without depositing a coin in the machine. Near the pop machine there were some sandpaper, tools, and a couple of other items that had been assembled on a truck which was used to transfer articles in and out of the building. He further testified that six or seven employees took orders in the place of business and were there on July 17. He discovered the items on the truck about 8:15 in the morning of July 18. The items placed thereon were not to fill any orders that might have been received for those specific items. He was handed an exhibit consisting of sandpaper and metal cloth used for sanding metal, a type of item carried in stock, and testified that this sandpaper stock was located directly across the aisle from the pop machine on the first floor and in the stockroom.

He next identified three crescent-type wrenches known as "Herbrand" and "Diamond Calk" handled as a part of the business of the company. Two of these wrenches were new and one slightly used. These new wrenches were on display behind the counter in the show room toward the north end of the building. These items were on the truck the morning of July 18. He identified an exhibit which was a handle for a socket wrench, one-half inch drive-in size, and the type of handle used in the company's business. This item was kept on the same display board where the crescent wrenches were kept, and was one of the items that was on the truck on the morning of July 18. He was handed an exhibit, a pair of 6-inch pliers made by the Diamond Calk Company, handled by the company and part of its stock which was kept at two or three places in the building. He did not recall seeing this particular item on the truck. Another exhibit, containers for reamers, generally called taps for tapping out holes for threads and bolts, was identified by him. He testified that they were kept directly behind a partition that supports the display for the wrenches. He identified another exhibit, a fabric cement called Tehr-Greeze, used for repairing canvas or cementing wood and handled as a part of the stock in the business. It was one of the items found on the truck on the morning of July 18. He identified an exhibit, a belt lacing machine used for putting wire lacing on belts to splice them together to make them more or less endless, carried as a part of the stock. It was kept in stock in either the shipping room in the back of the building or on the deck. This witness testified that he did nothing with these items, but called the police and they came and took them. He then identified an exhibit consisting of book matches with the name "Port Huron Machinery & Supply Company" printed on them which are used as an advertising device by the company. A supply is carried on the display counter for the convenience of customers. He also identified a steel tape, 72 inches

long, with the name "Port Huron Machinery & Supply
Company, Lincoln, Nebraska" on it. He testified that
he personally had such a rule which he kept in the middle
drawer of his desk. It was not there on the morning of
July 18. He identified another exhibit called an "express
tap" for threading a hole, a type of item the company
kept in stock next to the wrenches. There was no other
distributor of these items in this state that he knew of.
He identified a small screw driver with the name "Port
Huron" engraved or lettered on the handle, used as an
advertising device for the company some time past. He
testified that he had a screw driver such as this in his
desk prior to and on July 17. There was more than one
screw driver in his desk, but one was missing the morn-
ing of July 18. He identified another tap, to serve the
same purpose as the previous one he had identified, and
which was of the general type handled by the company
and in stock. He testified that they did not supply these
taps to dime stores. He further testified that the taps
for threading a hole were valued at $1.10 each.

On cross-examination this witness testified that to the
best of his knowledge all the doors of the building were
locked except the front door which they use to leave
the building; that at 3 p. m., on July 17, 1957, the com-
pany was open for business and the doors open to the
public; that there was no evidence that any locks had
been tampered with or broken; that he did not know
how the items he spoke about were placed on the truck,
he did not see them put there; and that with reference
to the little screw driver, they bought about 250 of them
5 years ago for distribution.

On re-direct examination this witness testified that he
did not see the defendant in the store at any time on
July 17, 1957, and that he never saw the defendant until
the officers brought him up from the basement.

A lieutenant of police testified that he made an in-
vestigation on July 18, 1957, at the company's place of
business; and that, with reference to the items identi-

fied as exhibits and in evidence, he contacted the employees of the company with reference to the tools that were placed on the truck, as to whether any one of the employees made up an order for these articles and placed the same where they were found the next morning. He also checked the route to determine the various places from which these items were taken, and checked the general layout of the building, the exits, and the washrooms.

The assistant chief of police talked to the defendant in his office shortly before noon on July 18, 1957, in the presence of the county attorney, after making an investigation at the place of business of the company. He testified that he asked the defendant where he was the day previous and he stated that on the afternoon of July 17 he came to Lincoln and went to his attorney's office; that he then went to the courthouse with an attorney; that they were at the courthouse for a short time and then went back downtown, leaving the courthouse about 4 o'clock in the afternoon; that he stopped at the dime store and then went and had a glass or two of beer; that he then went to the Salvation Army to see Captain Kennedy, but he did not find him; and that he then picked up his car from where he had parked it, but he was unable to give the location where his car was parked. After he picked up his car, he drove to Q Street and parked his car in the block between Eighth and Ninth Streets. He got out of the car and walked to Ninth and Q Streets, then over to Ninth and P Streets, west on P Street to Eighth Street, and north on Eighth Street up to the loading dock of the Port Huron Machinery & Supply Company. After he got up on the loading dock, he came to the double doors on the west side of the building. He wanted to use the rest room, and he noticed a man standing there wearing a straw hat and a pair of overalls—he could give no better description of the man— and asked about using the rest room. This man pointed out the rest room, and he went into the rest room. He

came out of the rest room and laid down on the floor. He was asked where he had laid down on the floor, and he did not recall that, but he said it was not in the basement or on the second floor. He said he was never in the basement or second floor at any time while he was in the building; and that the next thing he remembered, after lying down on the cement floor, was when someone was "putting the irons on him." He was asked where he got the two taps, and he stated that he bought them in the dime store in Omaha on July 13, which was the Saturday previous to his arrest. As to the three books of matches, the defendant said that he picked them up at the Port Huron Machine Works when he was there on the first of July with his brother, and that he had put them into another suit at home. He said he did not smoke, he just picked up the matches. As to the steel tape measure, he stated that he purchased it in Omaha at the National Motor or Automobile Supply, on July 13. With reference to the souvenir screw driver, he stated that he purchased it in the dime store in Omaha at the same time he purchased the taps.

The defendant's brother testified that the bonds found in the defendant's automobile were part of the estate of defendant's wife which was recently settled, and that he was the guardian of the estate and person of the defendant.

It was stipulated that the defendant was confined to the Lincoln General Hospital the last week of July 1957, and was under observation by doctors.

Before the submission of the case to the jury, the defendant demurred to the evidence and moved for an order dismissing the information and discharging the defendant or, in the alternative, instructing the jury to return a verdict of not guilty in favor of the defendant. The foregoing motions were based on the proposition that the information failed to state a crime or facts sufficient to constitute a crime under the statute, and also to the

effect that the evidence was not sufficient to support the verdict. These motions were overruled.

After the verdict was returned, the defendant moved for an order to arrest the judgment, set aside and vacate the verdict, and grant the defendant a new trial, which motion was overruled. Thereafter the defendant was sentenced to be imprisoned in the Nebraska State Penitentiary.

In the light of all of the evidence, both direct and circumstantial and as heretofore set out, we conclude that the guilt or innocence of the defendant of the charge made against him was under the circumstances of this case a matter for the jury to decide. The credibility of the witnesses and the weight of the evidence were for the jury to consider and determine and its conclusion may not be disturbed by this court unless clearly wrong. See, Burnell v. State, 159 Neb. 349, 66 N. W. 2d 838; Larson v. State, 161 Neb. 339, 73 N. W. 2d 388.

The sentence and judgment of the district court should be and they are affirmed.

AFFIRMED.