STATE OF NEBRASKA, APPELLEE, v. CHARLES F. BUNDY, APPELLANT.

147 N. W. 2d 500

Filed December 22, 1966. No. 36354.

William L. Walker, for appellant.

Clarence A. H. Meyer, Attorney General, and Calvin E. Robinson, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and BOYLES, District Judge.

BROWER, J.

An information containing two counts was filed against the defendant, Charles F. Bundy, in the district court for Lancaster County. The first count accused him of willfully, maliciously, and forcibly breaking and entering a dwelling house on January 9, 1966, with intent to steal property of value. The second count accused him of being a habitual criminal. A trial to the jury in dis-

trict court resulted on March 8, 1966, in a verdict of guilty on the first count, and at a subsequent trial to the court, he was found to be a habitual criminal and judgment was entered sentencing him to 10 years in the Nebraska Penal and Correctional Complex. He has brought the case here by an appeal.

Such of the assigned errors as are necessary to our decision will be stated as they are discussed.

Defendant contends the verdict and judgment of guilty on the first count was contrary to law and not supported by the evidence, and the trial court erred in overruling his motion to set aside and vacate the verdict for that reason. It is, consequently, necessary to review the evidence which we consider pertinent and controlling.

The testimony shows Henry Schmidt and Katherine Schmidt, husband and wife, occupied the dwelling at 946 North Eighth Street in Lincoln, Nebraska. Henry Schmidt was working as a city fireman at the fire station on Sunday, January 9, 1966. At 10 a.m., Robert D. Goodman, her son-in-law, drove to the Schmidts' home and got Katherine Schmidt and took her to spend the day at her daughter's place. Before leaving, she made sure that all the doors were locked. Goodman brought Mrs. Schmidt back to her home in his automobile at 7:15 p.m. that evening. Their car approached the home in an alley from the east. They noticed a Ford panel truck parked in the alley behind the house. Leroy Cole, who was then standing across the street, crossed over and conversed with Goodman until two policemen came in a cruiser car, arriving at 7:20 p.m. One officer talked with Cole while the other went into the house and observed the broken glass and displaced articles later mentioned.

On entering her home, Mrs. Schmidt discovered several guns lying on the kitchen floor which were previously kept in the gun rack in the bedroom. Glass was broken in the back door and both doors were ajar. A television set was removed from its stand and a record player and several records which were kept elsewhere

were all placed on the bed. The little change of their son who was absent was dumped out of the container with two "little expensive" wristwatches. A large screwdriver, found on a dresser, did not belong to Mr. Schmidt and had not been there when she left. Mrs. Schmidt called the police.

Leroy Cole testified for the State. He stated he drove the defendant, between 11 a.m. and 11:30 a.m. on January 9, 1966, to his home at 2322 T Street in Lincoln, Nebraska, where the defendant was invited to have dinner. About 7 p.m., Cole and the defendant decided to visit Cole's son confined in the hospital. The two thereupon left the Cole home in a 1956 Ford panel truck owned by Cole's father-in-law and driven by Cole. On the way to the hospital the defendant said he wanted to drive past the home of one Neiderhouse at Eighth and Y Streets. They drove by it and, in starting to leave, turned a corner and went through an alleyway where Cole stopped the car at the defendant's request. Defendant got out and went to the house and Cole got out to go to the toilet. While in the alley Cole heard glass break. Thereafter he went to the house, found the glass broken and the door open. Going inside, he called to the defendant who replied that he was in the house. Defendant requested Cole to take some of the articles to the car. Cole went outside, saw car lights, and knew someone was coming. He went back into the house rather than leave the defendant "stranded like that." Cole panicked because of the lights, and ran out the front door, crossed the street, and went behind a neighboring house where defendant met him. Cole told the defendant he would have to return to get his father-in-law's car so the latter would not become implicated. Defendant told Cole to meet him on a street by the interstate access route. Cole recrossed the street to the Schmidt premises where, after conversing with Goodman and the officers, he was arrested and taken to the police station. He was serving time in the Nebraska Penal and

Correctional Complex on matter involving the same incident.

Mrs. Leroy Cole testified that in the evening she was in the front room of their home on the first floor near the door watching television when defendant and Leroy Cole left the house "a little bit before 7:00 (p.m.)." She never saw the defendant again until 30 or 40 minutes later when he again entered the door and, without speaking, went directly to the basement recreation room where there were three other men who had been drinking beer and viewing television during the day. About 5 minutes thereafter she answered a phone call which came from the police. Going to the basement she asked the defendant about her husband and he said, " 'Well, maybe he went for a ride by himself.' " The other men in the recreation room then went upstairs, and the defendant told Mrs. Cole "that if we wouldn't say anything and just go along sort of, something to that nature, that everybody would get out of it all right." Defendant then went upstairs to a bedroom in which there was a baby of another lady staying at the home.

Defendant testified on his own behalf. He stated that at 6:50 p.m. on the day in question, Cole asked him to go to the hospital to see Cole's son. Defendant responded, " 'I don't know; I don't think so. We'll see.' " The two men went outside and argued as to defendant going. After 5 or 10 minutes it was decided Cole should go alone. Defendant returned to the house but entered by the back door. He started to go downstairs where the men were but changed his mind and went to the bedroom to play with the baby. About 10 or 20 minutes later he heard a car and went to the living room where Mrs. Cole asked, " 'Are you and Leroy back?' " He answered he had been nowhere and then went downstairs where the men were. Mrs. Cole came down and asked about her husband and said the police had him. Defendant said he did not know what she was talking about. When Mrs. Cole stated the police were coming, he said,

" 'Well, let them come.' " The baby was crying so he went back to the bedroom.

A taxi driver testified on rebuttal that on January 9, 1966, at 7:45 p.m., he picked up a man at the Cloverleaf Motel and delivered him to 2322 T Street, the address of the Cole home. The addresses and time are on the driver's trip ticket introduced in evidence. The driver testified the defendant was his passenger on that trip. He testified the passenger had a screwdriver but denied that it was one in evidence found in the Schmidt home.

Captain Lowell Sellmeyer of the police force on rebuttal also testified the defendant told him at the police station the morning after his arrest that he had been at the house at 2322 T Street until shortly before 7 p.m. that evening. He had gone with Leroy Cole outside to his car. They sat there for 10 or 15 minutes and then he had refused to go to the hospital with Cole. The defendant stated to him that, getting out of the car, he had walked to the Cole house and was admitted by Mrs. Cole, and that he went directly to the basement where the men were and remained until the police came. The officer testified the Cloverleaf Motel was approximately 5 blocks from the Schmidt home and there was an outdoor pay telephone a block from the motel at 1216 North Tenth Street.

The stories related in the testimony of Leroy Cole and the defendant are in direct conflict. There was evidence, if believed, tending to substantiate Cole's testimony. In Sedlacek v. State, 166 Neb. 736, 90 N. W. 2d 340, this court stated: "It is the province of the jury to determine the circumstances surrounding and which shed light upon the alleged crime; and if, assuming as proved the facts which the evidence tends to establish, they cannot be accounted for upon any rational theory which does not include the guilt of the accused, the proof cannot, as a matter of law, be said to have failed.

"This court in a criminal action will not interfere with a verdict of guilty based upon conflictng evidence,

unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt.

"The credibility of witnesses and the weight of the evidence are for the jury to determine in a criminal case in which the evidence presents an issue of fact as to the guilt or·innocence of the accused and the conclusion of the jury may not be disturbed by this court unless it is clearly wrong."

In this case we cannot say the evidence was insufficient as a matter of law to support a finding of guilt beyond a reasonable doubt. There was ample evidence, if given credence, that the defendant broke and entered the dwelling· and was preparing to remove property therefrom. This was sufficient to support the verdict. The contention of the defendant has no merit.

The defendant assigns error to the giving of instructions Nos. 6, 9, 10, and 11, but in the argument in his brief, although they are all set out at length, he fails to point out wherein any or all of them did not state the law properly. We find no error in them either. Defendant merely asserts the evidence was insufficent to sustain the verdict under the instructions given. That question has already been decided adversely to his contentions.

Defendant maintains the trial court erred in failing to find his constitutional rights were violated when he was interrogated by captain Sellmeyer subsequent to his arrest. He contends the interrogation violates the rules laid down by the Supreme Court of the United States in Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, and Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977. In Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882, it was held the guidelines laid down in Miranda v. Arizona, *supra*, are available only to persons whose trials had begun on or after June 13, 1966, and that rules in Escobedo applied to all cases tried after June 22, 1964.

We need not consider Miranda, but should consider the case before us in the light of Escobedo. In Escobedo v. Illinois, *supra*, the Supreme Court of the United States held: "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U. S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." In Johnson v. New Jersey, *supra*, the court plainly stated this was the essence of Escobedo. In the present case, captain Sellmeyer's testimony was given on direct examination without any objection whatever. Neither was he asked any questions by defendant's counsel either on voir dire or cross-examination concerning the interrogation or the foundation with respect to this testimony. It was not shown that defendant asked for or was denied an attorney. Neither does it appear that he was not informed of his right to remain silent. No questions were asked concerning such warning. At a trial occurring prior to June 13, 1966, it is not error to admit into evidence statements made by an accused during custodial interrogation by the police where the voluntariness thereof is not challenged and there is no evidence that prior to the statements the defendant had requested and been denied an opportunity to consult with counsel. See State v. Worley, 178 Neb. 232, 132 N. W. 2d 764. The error assigned by the defendant cannot be sustained.

Error is assigned to the trial court in overruling objections of defendant's counsel to questions directed by the prosecution to officer Kenneth Wade with respect to the fair market value of the personal property allegedly attempted to be taken from the Schmidt dwelling. The items referred to were those hitherto mentioned as having been removed from their usual resting place. Wade had entered the home and viewed this property and so testified. He said he had seen such items before and knew their price. There was no foundation laid to show Wade was an expert. Over objections that the questions were incompetent, irrelevant, and immaterial, and that no proper or sufficient foundation was laid, the witness testified that the five guns were worth $200, the television set $60, and the record player $15. It is unnecessary to consider the sufficiency of the foundation. The questions asked and answers given were immaterial and irrelevant. Section 28-532, R. R. S. 1943, defining the crime of burglary, only requires that the breaking and entering be with "intent to steal property of any value." In Schultz v. State, 88 Neb. 613, 130 N. W. 105, 34 L. R. A. N. S. 243, this court said: "No witness testified that the property in the mill was of any value, nor does the proof show there was any personal property therein save the safe and its contents and an office desk. The owner testified that nothing other than some papers was missing and they were subsequently found in a barrel near the mill. These documents were of sufficient importance to impel him to search for them. The jury would be justified in finding that the documents were of some value." Here the five guns, television set, and record player were property of a nature that a jury could and naturally would infer to be of value and no further proof was necessary. Section 29-2308, R. R. S. 1943, however, in part provides: "No judgment shall be set aside, or new trial granted, or judgment rendered in any criminal case, on the grounds of * * * the improper admission or rejection of evidence, * * * if the Supreme

Court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred." We fail to see that the valuations placed upon the property by the witness prejudiced the defendant. The nature of the property involved was such that any jury with common knowledge of the affairs of the world would infer it had not only some, but substantial value. Whether it was $25, $50, or $200 was immaterial, but we fail to see how the value assigned by the witness was prejudicial to the defendant. The error was harmless to the defendant's rights and the assignment cannot be sustained.

The defendant further maintains the trial court erred in finding and ordering that the defendant was a habitual criminal and punishing him as such. Defendant seems to base his contentions on section 29-2222, R. R. S. 1943, which reads as follows: "At the hearing of any person charged with being an habitual criminal, a duly authenticated copy of the former judgment and commitment, from any court in which such judgment and commitment was had, for any of such crimes formerly committed by the party so charged, shall be competent and prima facie evidence of such former judgment and commitment." Defendant argues this statute, in providing that a duly authenticated copy of the former judgment and commitment shall be competent and prima facie evidence of such former judgment and commitment, is a limitation on the method of proving such prior conviction and commitment. He claims the cited section points out the only acceptable method of proof and that method is exclusive. We think not. The purpose of the statute is to give competency and weight to the particular evidence mentioned. The fact that the statute states it is prima facie evidence of such former judgment and commitment is itself suggestive that other proof may be received also. We conclude that section 29-2222, R. R. S. 1943, does not confine the proof on the issue of defend-

ant being a habitual criminal wholly to the documents therein mentioned.

In the case before us, considerable evidence was introduced bearing on the defendant's previous convictions, sentences, and commitments. Exhibit 5 is a copy of the information and docket entries in the office of the clerk of the circuit court of Hancock County, Illinois. The docket shows Charles Bundy was found guilty of the crime of forgery on March 24, 1959, and sentenced to the Illinois State Penitentiary System on April 15, 1959, "for a period of one to fourteen years and more specifically a mimimum of three years and a maximum of five years unless sooner discharged by due process of law." Exhibit 3 was a certified copy of the conviction and sentence of defendant for the period of 2 years to the Nebraska Penal and Correctional Complex in the district court for Lincoln County, Nebraska, for the crime of breaking and entering with intent to steal property of value on April 29, 1964. Exhibit 4 was the original commitment to the Nebraska Penal and Correctional Complex on the conviction in Lincoln County. Exhibits 5, 4, and 3 were admitted in evidence. Exhibit 5 seems to be authenticated under the act of Congress. The defendant seems to maintain even if other proof, aside from the particular documents mentioned in section 29-2222, R. R. S. 1943, might be considered on the issue of defendant being a habitual criminal, the admissibility of the documents in evidence also depends upon their being authenticated, which he seems to claim should in all cases be as required of judgments from foreign states under the act of Congress. This is not necessary for us to determine. It is sufficient to say they are in evidence, and that not only was no objection made to their being received, but at the trial the defendant's counsel specifically stated he had no such objection. Where counsel for a party specifically states in the trial court that he has no objection to the introduction of certain documents, he cannot on appeal urge that they

were improperly certified or authenticated and for that reason not admissible.

The defendant did object to the reception of exhibit 6 in evidence because it was not properly authenticated. It purports to be a mittimus issued to the "warden or keeper" of the Illinois Penitentiary System. It is certified to only by the record clerk of the Illinois State Penitentiary at Joliet, Illinois. The objection to its introduction was sustained. Defendant therefore argues that there is no evidence that he was actually committed in Illinois and hence no evidence that he was a habitual criminal under sections 29-2221 and 29-2222, R. R. S. 1943. We think it is unnecessary to review the other evidence, consisting of admissions made to a police officer, testified to without objections, and testimony of the officer in charge of records in the Nebraska Penal and Correctional Complex, and records introduced from said complex tending to show the defendant was confined more than 3 years in the state penitentiary in Illinois and more than 1 year in the Nebraska Penal and Correctional Complex on the previous charges mentioned.

Exhibit 5, showing the conviction and sentence in Hancock County, Illinois, and exhibit 3, showing the conviction and sentence in Lincoln County, Nebraska, are both in evidence and it is shown the defendant was the same person in the two cases. In Rains v. State, 142 Neb. 284, 5 N. W. 2d 887, this court in its opinion stated: "Defendant urges that proof of commitment, as required by the habitual criminal law, was lacking. We think not. Another statute, section 29-2401, Comp. St. 1929 (now section 29-2401, R. R. S. 1943), provides that within 30 days after sentence, unless execution thereof be suspended, the convicted person shall be delivered to the warden of the penitentiary, together with a copy of the sentence of the court, there to be kept until the sentence is served or a pardon granted. If sentence is suspended and the conviction subsequently affirmed, the same procedure is prescribed. It must necessarily

be presumed in the absence of any evidence to the contrary that the directions of the statute were carried out by the public officers involved. We think the proof offered is in all respects sufficient to sustain the finding of prior convictions within the meaning of section 29-2217, Comp. St. Supp. 1939 (now section 29-2221, R. R. S. 1943)." The Illinois statutes on this point are not shown, but: "In the absence of the common law or statutes of any other jurisdiction in the United States being pleaded and presented we will presume the common law or statutes of such other jurisdiction to be the same as ours." Scott v. Scott, 153 Neb. 906, 46 N. W. 2d 627, 23 A. L. R. 2d 1431. The defendant's contention that the trial court erred in finding him a habitual criminal and sentencing him as such has no merit.

We cannot sustain the defendant's contentions with respect to any of the errors urged by him. It follows that the judgment and sentence of the trial court with respect to both counts of the information be and the same are affirmed.

AFFIRMED.